259 N.J. Super. 538 (1992)
614 A.2d 642
RELIANCE INSURANCE COMPANY, PLAINTIFF,
v.
ARMSTRONG WORLD INDUSTRIES, INC., DEFENDANT.
Superior Court of New Jersey, Law Division Cumberland County.
Decided July 17, 1992.
*541 Eisenstat, Gabage & Berman, Attorneys for Plaintiff (Charles W. Gabage, Counsel).
Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Attorneys for Plaintiff (Steven R. Fischer, Counsel; Regina A. Vogel and Deborah Weinstein, on the Brief).
Cohen, Shapiro, Polisher, Sheikman and Cohen, Attorneys for Defendant (Judah I. Labovitz, Counsel; Mark S. Herr, on the Brief).
Covington & Burling, Attorneys for Defendant (Robert N. Sayler, Counsel; Kenneth L. Doroshow, Counsel).
KLEINER, J.S.C.
Reliance Insurance Company has filed a complaint for declaratory judgment seeking a ruling that it is not liable to its insured, Armstrong World Industries, Inc., (hereafter Armstrong) for the defense expenses and settlement obligations *542 incurred by Armstrong in its response to environmental contamination damage claims asserted against Armstrong by the American National Can Corporation (hereafter ANCC). This matter is now before the court on Armstrong's motion for summary judgment and a cross motion filed by Reliance.[1]
Although environmental damage claims asserted against insureds have sparked numerous judicial rulings involving insurers' indemnity responsibility, the primary issue raised in this litigation has not been specifically addressed in any reported New Jersey decision. The issue posed is whether environmental contamination damage resulting from pollution of a long duration constitutes damage attributable to an "accident" within the ambit of a comprehensive property liability insurance policy.
The litigation which provoked this declaratory judgment action was filed on January 9, 1989, in the United States District Court for the Northern District of Illinois, Eastern Division, bearing Docket Number 89-C-168, wherein American National Can Company was plaintiff and Kerr Glass Manufacturing Corporation (hereafter Kerr Glass) was the initial sole defendant. That action was a suit to recover damages for contamination at a glass container manufacturing plant located in Millville, New Jersey.
The ANCC property was first established as a factory site in the 1800's by the Whitall-Tatum Company, (hereafter Whitall-Tatum). In 1938, Armstrong, also a glass manufacturer, acquired the property from Whitall-Tatum, and thereafter, sold the facility on March 31, 1969, to Kerr Glass. The asset-purchase agreement between Armstrong and Kerr Glass contained an indemnity provision:
Armstrong shall indemnify and hold harmless from and against any damage or loss suffered by Kerr as a result of ... any claim of any kind or nature *543 whatsoever with respect to the business carried on by Armstrong's Packaging Materials Operations arising out of facts or events occurring prior to the closing time.
In 1983, a portion of the site was sold by Kerr to ANCC. In April 1985, title was transferred by ANCC to Triangle Acquisition Corporation (hereafter Triangle.)
In anticipation of the sale to Triangle, ANCC was required by the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 to 35, to investigate the environmental conditions at the site, to complete any required cleanup of environmental conditions prior to transference, or, alternatively, to enter into an administrative consent order with the New Jersey Department of Environmental Protection (DEP) to guarantee the investigation and cleanup of the site, pursuant to the legislative statement of policy set forth in N.J.S.A. 13:1K-7.
The Legislature finds and declares that the generation, handling, storage and disposal of hazardous substances and wastes pose an inherent danger of exposing the citizens, property and natural resources of this State to substantial risk of harm or degradation; that the closing of operations and the transfer of real property utilized for the generation, handling, storage and disposal of hazardous substances and wastes should be conducted in a rational and orderly way, so as to mitigate potential risks; and that it is necessary to impose a precondition on any closure of transfer of these operations by requiring the adequate preparation and implementation of acceptable cleanup procedures therefor.
The investigation by ANCC disclosed environmental contamination resulting from the release of hazardous substances. It thereupon instituted suit naming Kerr Glass as a defendant, seeking contribution for environmental response and cleanup costs, pursuant to 42 U.S.C.A. § 9607(a) the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980.
Kerr Glass, in response, filed a third-party complaint against Armstrong for contribution and indemnification for the cleanup expenses attributable to waste disposal by Armstrong and its predecessor in title, Whitall-Tatum. ANCC, with leave of court, amended its complaint to include direct claims against Armstrong.
*544 Although the federal court ultimately issued an order for partial summary judgment against Armstrong, the parties on March 12, 1991 entered into a separate settlement agreement which terminated the litigation.[2] The financial responsibility of Armstrong pursuant to this settlement agreement caused Armstrong to seek indemnification from Reliance, its insurer from January 1, 1942, to January 1, 1953. Reliance has denied responsibility and has filed this suit for a declaratory judgment seeking to vindicate its position.
Armstrong was the named insured under comprehensive general liability insurance policies issued by Reliance or its predecessor, Standard Accident Insurance Company, (hereafter Standard Accident) for each year commencing January 1, 1942, and terminating January 1, 1952. Each policy was a policy for a one-year period.[3]
*545 As noted, the California stipulation was specifically included as a basis of the California decision and the court's ultimate judgment. It is undisputed that, although certain aspects of the California judgment are presently pending appeal, the Phase I issues have not been appealed and are binding upon the parties.
As a predicate to all rulings on these motions, Reliance seeks a preliminary ruling by this court, that the California decision, respecting insurance coverage and insurance policy terminology, is binding upon this court.
New Jersey recognizes that the collateral estoppel effect of a judgment is dependent upon the law of the state rendering it. Restatement (Second) of Conflict of Laws, § 95 comment g (1971); Lumbermens Mutual Casualty Co. v. Carriere, 170 *546 N.J. Super. 437, 452, 406 A.2d 994 (Law Div. 1979); Puzio v. Puzio, 57 N.J. Super. 557, 570, 155 A.2d 115 (App.Div. 1959).
A stipulated judgment is the equivalent of a judgment after a contested trial for the purposes of res judicata or collateral estoppel. California State Auto. Ass'n. v. Superior Court, 50 Cal.3rd 658, 788 P.2d 1156, 1161, 268 Cal. Rptr. 284 (1990). Additionally, where portions of a case are severable, the non-appealed part is final and res judicata. American Enterprise v. Van Winkle, 39 Cal.2d 210, 216, 246 P.2d 935, 937 (1952).
Armstrong had sufficient opportunity to completely litigate the issue of the existence of insurance policies for periods prior to January 1, 1942. It chose to forego that opportunity and to enter into a stipulation that encompassed and led to a judicial finding that:
"2. Armstrong has withdrawn its claims for Standard Accident liability insurance coverage to Armstrong for periods prior to January 1, 1942, and the Court, therefore, determines that there is no such coverage."
Although Armstrong now contends that the determination in California was too broad and was only meant to encompass a stipulation by it that it was abandoning its claim for pre-1942 products liability coverage and was not abandoning its claim as to pre-1942 general comprehensive liability coverage, it cannot be permitted to raise that assertion before this court. Such an argument contravenes the entire doctrine of collateral estoppel. Were Armstrong unsatisfied with the California judgment, which included the California stipulation, it could have petitioned the California court to amend its findings so as to limit the scope of paragraph "2." Were the amendment denied, it could have appealed or cross appealed that ruling as part of the now pending appellate review of other aspects of the California litigation.
Thus, for the purposes of this litigation, the insurance coverage under scrutiny shall be Standard Accident policies for the years commencing January 1, 1942, until January 1, 1952, *547 which contain identical policy terms, as fully delineated by the California judgment.[4]
Reliance also seeks a judicial determination that it had no duty to defend Armstrong in the ANCC litigation. Obtaining such a declaration through the mechanism of a summary judgment motion requires the court to find that Reliance owed no duty to indemnify Armstrong for any component of Armstrong's alleged liability arising from the complaint filed against Armstrong by ANCC.
Until this court concludes that there is no indemnity obligation owed Armstrong, this court is precluded from declaring that Reliance had no duty to defend Armstrong in the ANCC litigation and concomitantly no duty to reimburse Armstrong for the defense expenses that it incurred in defending and settling that litigation. Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Co., 98 N.J. 18, 483 A.2d 402 (1984); Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 267 A.2d 7 (1970). Until all issues of indemnification are resolved, Reliance's motion, as it pertains to this particular issue is premature and must be denied without prejudice.[5]

SCOPE OF COVERAGE
In any dispute respecting insurance coverage, the court must look to the insuring agreement. Each insurance policy issued by Standard Accident, Reliance's predecessor, contains the same clause respecting coverage:

*548 "Coverage C  Property Damage Liability ... [The insurer agrees T]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including loss of use thereof, caused by accident."
Each policy limits the coverage to the specific policy period, to wit, accidents which occur during the policy period.
The scope of coverage as to each policy is limited by two specific exclusions, an owned-property exclusion and a contractual-liability exclusion:
This policy does not apply ... to injury to or destruction of (1) property owned, occupied by or used by or rented to the insured, or (2) except with respect to the liability under sidetrack agreements and the use of elevators or escalators, property in the care, custody or control of the insured, or (3) any goods or products manufactured, sold, handled or distributed or premiums eliminated by the name insured or work completed by or for the name insured, out of which the accident arises.
This policy does not apply ... to liability assumed by the insured under any contract or agreement except... a contract as defined herein.
The word "contract" is defined in the "Conditions" section of the policy as:
"A warranty of goods or products or, if in writing, a lease of premises, easement agreement, agreement required by municipal ordinance, sidetrack agreement, or elevator or escalator maintenance agreement."
The absence within the policies in question of specific definitions of the words "accident" and "all sums which the insured shall become legally obligated to pay as damages ... caused by accident" becomes the foundation upon which this litigation rests.
In Mazzilli v. Acc. and Cas. Ins. Co., 35 N.J. 1, 7-8, 170 A.2d 800 (1961) our Supreme Court set forth, judicial principles that have continuously been cited by our courts.
Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. Kievit v. Loyal Protective Life Ins. Co., etc., 34 N.J. 475 [170 A.2d 22] (1961). Moreover, in evaluating the insurer's claim as to the meaning of the language under study, courts necessarily consider whether alternative or more precise language, if used, would have put the matter *549 beyond reasonable question; also whether judicial decisions appear in the reports attributing a more comprehensive significance to it than that contended for by the insurer. Mahon v. American Cas. Co. of Reading, Pennsylvania, 65 N.J. Super. 148 [167 A.2d 191] (App.Div. 1961). Insurance contracts are unipartite in character. They are prepared by the company's experts, men learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium. The circumstances long ago fathered the principle that doubts as to the existence of coverage must be resolved in favor of the insured. Barker v. Iowa Mut. Ins. Co., 241 N.C. 397, 85 S.E.2d 305 (Sup.Ct. 1955).
With those guiding principles at the forefront of its argument, Armstrong contends that as a matter of law it is entitled to summary judgment compelling Reliance to reimburse it for the expenses incurred in the ANCC litigation, which resulted in a settlement,[6] and for indemnification for expenses incurred by way of damages to ANCC or in remediation of all environmental claims asserted by the DEP. Additionally, Armstrong posits that other issues may also be determined as a matter of law.
Without specifically delineating each Armstrong argument, the positions taken by Armstrong must be analyzed within the context of its factual history submitted in its pleadings and briefs. Armstrong contends that on an indefinite date prior to January 1, 1942, contaminants were released on Armstrong's property which began to pollute that property until the result of that continuous pollution ultimately manifested itself and was discovered coincidental with ANCC's environment inspection preparatory to its sale to Triangle.
Armstrong contends the initial release of contaminants constituted an "accident" within the coverage provided by Reliance, and that all damages to property, including environmental remediation expenses incurred, are subject to indemnity by Reliance. Additionally, it contends that once insurance coverage is triggered, every policy of insurance written by Reliance and insuring Armstrong must be utilized to the extent of the *550 policy coverage to indemnify against the ultimate damage discovered upon the manifestation of the pollution.
Reliance's contra position may also be succinctly stated. The initial contamination, if deemed to be an "accident," only triggers insurance coverage coincident with the date of contamination for damages occurring as of that date, provided that such damage was not expected, intended or foreseen by Armstrong and further provided that the property allegedly damaged is not otherwise excluded from insurance coverage by either the "owned-property" exclusion or "contractual liability" exclusion contained within its insurance policies.
The thrust of each argument rests upon the definition of the word "accident" as used within the insurance policies issued by Reliance. The word "accident" is not specifically defined and thus this court must utilize principles of construction and judicial precedent to discern a correct definition.
Most helpful in this analysis are two decisions of our Appellate Court: Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987); and Diamond Shamrock Chemicals Co. v. Aetna Cas. & Surety Co., 258 N.J. Super. 167, 609 A.2d 440 (App.Div. 1992), (both authored by Judge Baime).
The interpretative process must recognize that the Reliance policies were issued between 1941 and 1952. All were pure "accident" based insurance policies. The multitude of judicial decisions cited by both litigants interpret issues of insurance coverage which focus on either pure "occurrence based" policies or "occurrence-based" policies with "pollution exclusion" contractual terminology. Both Broadwell and Diamond Shamrock, cited above, fall within this later category.
In a pure "accident based" policy, as written by Reliance, the policy specifically states:
"The insurer agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including loss of use thereof, caused by accident."
*551 The word "accident" is not defined.
As discussed in Broadwell, supra, 218 N.J. Super. at 520-521, 528 A.2d 76, those standard comprehensive liability insurance policies which are characterized as an "occurrence based" typically provide, as is seen in Broadwell:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage to which this insurance applies, caused by an occurrence ..."
"Property damage" is defined as:
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
(2) the loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
"Occurrence" is defined as:
"An accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
An "occurrence based" policy with a "pollution exclusion" as cited in Broadwell, Ibid., typically provides:
This insurance does not apply ... to bodily injury or property damage arising out of the discharge ... [of] contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, disposal release or release or escape is sudden and accidental.
The import of the decision in Broadwell rests on the proper interpretation of the words "sudden and accidental" as contained in a pollution exclusion clause. That decision, although particularly instructive, does not equate the word "accidental," an adjective, with the word "accident;" a noun, as used in the Reliance policies and the Broadwell decision is, therefore, not dispositive of the issues raised in this litigation.
The decision in Broadwell, supra, 218 N.J. Super. at 531-533, 528 A.2d 76, thoroughly analyzes the historical evolution of the *552 three types of insurance policies. Judge Baime's analysis deserves emphasis.
Through our research, we have traced the history of the "occurrence" policy definition and the pollution exclusion to the industry-wide revisions of standard general liability insurance provisions in 1966 and again in 1973. Before 1966, the standard policy covered only property damage and personal injury "caused by accident." ... The policy did not define the word "accident," leaving that task to the courts. The courts generally defined "accident" as "an unexpected happening without intention or design." .. . Under this test, a volitional act by the insured nevertheless qualified as an "accident" if the insured did not specifically "intend to cause the resulting harm or [was] not substantially certain that such harm w[ould] occur....
In the 1966 revision, the insurance industry switched universally to "occurrence-based coverage." ... This change was "in response to consumer demands for broader liability protection and in acquiescence to the judicial trend toward a more expansive reading of the term accident ..."
The definition [of "occurrence"] was designed to "make it clear that occurrence embraces not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time."
The pollution exclusion was added by the 1973 revision. Under this exclusion, only pollution-related losses that arose from occurrences both "sudden" and "accidental" were to be covered. .. . the insured could not "seek protection from his liability insurer if he knowingly pollute[d]" the environment. Although it has been argued that the sole object of this clause was to limit coverage to accidents distinct in time and place ... the more reasonable conclusion is that the exclusion was designed to "eliminate coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence excluded by definition of "occurrence." (citations omitted).
The entire issue in Broadwell was whether expenses incurred by Broadwell in its effort to comply with a DEP cleanup directive respecting gasoline leakage fell within the insurance coverage provided by an "occurrence-based" policy with a "pollution exclusion" clause. The term "sudden" within the pollution exclusion clause "sudden and accidental" was interpreted to mean "unexpected and unintended," Id. at 536, 528 A.2d 76. The trial court's decision granting summary judgment to Broadwell was reversed and remanded to develop a factual record to determine whether the leakage was unexpected and unintended, i.e. "sudden." The court was not called upon to define or interpret "accident" as that term is used in the Reliance policies.
*553 It is within the context of Broadwell, that Diamond Shamrock, must be analyzed.
Diamond Shamrock involved, in part, claims asserted by the DEP relating to environmental pollution caused by the release of dioxins and other hazardous chemicals and extensive claims for property damage and bodily injury asserted by residents in the surrounding areas of the Diamond Shamrock property. The insurance policies in issue covered three separate periods. Policies in effect from 1951 to 1960 which were "accident based"; policies in effect from 1960 to 1970 which were "occurrence based"; policies issued between 1971 and 1985 which were "occurrence based" but which also contained a "pollution exclusion" clause.
It is not necessary to review the entire basis of the trial court opinion which denied coverage under each type of policy. Suffice it to say, as to the "accident based" policies, the trial court defined "accident" as a "discrete fortuitous event which happens within a short time at a specific time and place." In denying coverage the trial court emphasized that the contamination was the result of "a continuous process of discharging and spilling chemicals ... which gradually produced contamination levels of a number of priority pollutants," ... Thus gradual degradation of the environment ... [was] not attributable to any definite event," and therefore the court found that the loss was "not `caused by accident.'" Diamond Shamrock Chemicals Co. v. Aetna Cas. & Surety Co., supra, 258 N.J. Super. at 190, 609 A.2d 440.
The trial court based its denial of coverage on the remainder of the claims asserted under the "occurrence based" policies, because the court determined the pollution was fully intentional and therefore it was not an "occurrence" or fell, where applicable, within the ambit of the pollution exclusion.
The Appellate Division, although affirming the trial court result which denied coverage stated:

*554 "... We have no occasion to decide whether the Chancery Division judge was correct in defining the word `accident' to mean `a discrete fortuitous event which happens within a short time at a specific time and place.'" Id. at 199, 609 A.2d 440.
The court also stated, "In any event, we leave resolution of the issue to another day." Id. at 200, 609 A.2d 440.
Lastly, the court was not required to pass upon the trial court's definition of "accident," as it concluded that the trial court's finding that "Diamond knowingly and routinely discharged contaminants over a period of 18 years" was a correct determination. Additionally, the Appellate Division stated:
None of the insuring agreements, covered Diamond's intentional and knowing polluting activity. Whether or not one subscribes to the Chancery Division judge's definition of "accident," it is plain beyond peradventure that the intentional and deliberate acts of the insured do not fall within the purview of the policy language.
Id. at 211, 609 A.2d 440.
Reliance's position in support of its motion for summary judgment here is predicated upon the very definition of "accident" which the Appellate Division specifically did not endorse in Diamond Shamrock. Reliance stresses the concept of temporality as constituting the basis of coverage and would require the insured to delineate a specific event resulting in pollution with resulting definable and immediately manifested damage. Without a definitive event, Reliance contends that Armstrong cannot ascribe that pollutant damages relate to an event within the policy term covered by a particular policy.
Broadwell, supra, 218 N.J. Super. at 532, 528 A.2d 76, accepted the long recognized definition of "accident" as "a unexpected happening without intention or design." This definition does not limit the definition by temporality nor does Black's Law Dictionary (1991) which defines "accident" as "a fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence."[7]
*555 It must be noted that in discussing the Chancery Court definition in Diamond Shamrock, supra, 258 N.J. Super. at 199-200, 609 A.2d 440, the Appellate Division reviewed numerous cases supporting the concept of "unforeseen" or "unexpected" and specifically indicated that in the context of worker's compensation decisions, the "temporal aspect" of any definition of "accident" has been questioned. See, e.g., Spindler v. Universal Chain Corp., 11 N.J. 34, 38, 93 A.2d 171 (1952); Neylon v. Ford Motor Co., 8 N.J. 586, 588, 86 A.2d 577, rev'd on other grounds, 10 N.J. 325, 91 A.2d 569 (1952). The Appellate Division has thus implicitly confirmed that the concept of temporality should not be included within the definition of "accident."
It would therefore appear that an "accident" must be defined as an unforeseen or unexpected event, and when used in the context of an insurance policy, it connotes that one may be insured against its results, wherever or whenever they occur, provided there is a causal relationship between the unforeseen or unexpected event and the ultimate resulting damage.
Such a definition is consistent with the historical evolution from "accident-based" policies to "occurrence based" policies. The definition of "occurrence" was designed to "make it clear that occurrence embraces not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time." See 3 Long, The Law of Liability Insurance, App.-53 (1966), and Broadwell, supra, 218 N.J. Super. at 533, 528 A.2d 76.
The definition of "occurrence" was not a new concept of insurance coverage that was previously unrecognized, but a definition which clarified the traditional concept of "accident." The term in essence constituted the insurance industry's recognition that an accident could encompass an "unforeseen" or *556 "unexpected" event with instantaneous results or an "unforeseen" or "unexpected" event with results which are, or are not, immediate or totally cognizable, discernable, or manifested. This conclusion is also consistent with the court approved definition of "sudden" as construed in conjunction with the standard pollution exclusion. The word "sudden" does not have a "temporal" meaning. Diamond Shamrock Chemicals Co., supra, 258 N.J. Super., at 199-201, 609 A.2d 440.
Lastly, Reliance asserts that the definition of "accident" which it propounds is the most appropriate, as it constitutes the reasonable expectation of Armstrong in 1942 when its insurance policy was first purchased. It contends that discovery should be permitted on the issue of reasonable expectation and posits that Armstrong, as a sophisticated insured, knew that contamination resulting in subsequent manifested damages would not constitute an "accident" and therefore Armstrong's claims for insurance indemnification should be denied.
This position is specifically rejected. In CPS Chemical Co. v. Continental Ins. Co., 222 N.J. Super. 175, 189-190, 536 A.2d 311 (App.Div. 1988), the court, in construing insurance policy terminology in an environmental damage dispute, stressed:
Our courts have thus adopted the principle giving effect to the "objectively reasonable expectations" of the insured for the purposes of rendering a "fair interpretation" of the boundaries of insurance coverages. Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 612 [503 A.2d 862] (1986), quoting DiOrio v. New Jersey Manufacturers Insurance Company, 79 N.J. 257, 269 [398 A.2d 1274] (1979). See also Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305 [208 A.2d 638] (1965); Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482 [170 A.2d 22] (1961).
These principles are no less applicable merely because the insured is itself a corporate giant. The critical fact remains that the ambiguity was caused by language selected by the insurer ... The ambiguity thus created must be resolved against insurers.
In Diamond Shamrock Chemicals Co., supra, 258 N.J. Super. at 207-09, 609 A.2d 440, the Appellate Division specifically rejected considerations of the "sophistication" or "knowledge" of the insured. The court specifically held:

*557 Other than noting the litigation explosion that has been generated by the ambiguous wording of the pollution exclusion, we need not further address the issue. We merely add that we deem this case an inappropriate vehicle for consideration of the question.
Finally, we do not reach the issue of whether Diamond, as a "highly knowledgeable purchaser of insurance," had "substantial bargaining power" and deliberately negotiated an insurance agreement containing a pollution exclusion which was intended to deviate from the standard policy provision as construed in Broadwell. The Chancery Division judge recognized that he was bound by our holding in Broadwell. However, he found that "in purchasing the policies in question Diamond understood and expected that the pollution exclusion barred coverage for the kinds of claims which [ultimately arose] out of the operation of the Newark plant." Citing Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 38 [548 A.2d 188] (1988) and Zuckerman v. Nat. Union Fire Ins. Co., 100 N.J. 304, 320-21 [495 A.2d 395] (1985), the Chancery Division determined that, as a sophisticated insured, Diamond knew that its policies did not cover damage caused by the gradual discharge of pollutants.
We harbor reservations concerning this conclusion. Although the "sophistication" and "knowledge" of an insured may be a factor in determining whether an insurance policy is a "contract of adhesion," see Werner Industries, Inc. v. First State Inc. [Ins.] Co., 112 N.J. at 38 [548 A.2d 188], questions concerning the impact of this circumstance have received comparatively little attention. While our research discloses no reported New Jersey decision dealing with the precise issue, other jurisdictions have held that "the exception to the strict rule of construction applies only when the terms of the policy were negotiated between the parties...." Bank of West v. Superior Court, 225 Cal. App.3d 121, 275 Cal. Rptr. 39, 47 (App.Ct. 1990), vacated, 4 Cal. App.4th 1622, 226 Cal. App.3d 835, 233 Cal. App.3d 213, 277 Cal. Rptr. 219, review granted, 279 Cal. Rptr. 777, 807 P.2d 1006 (1991). Stated somewhat differently, only where it is clear that an insurance policy was "actually negotiated or jointly drafted," and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked. AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 274 Cal. Rptr. 820, 832, 799 P.2d 1253, 1265 (1990). See also Keating v. National Union Fire Ins. Co. of Pittsburgh, Pa., 754 F. Supp. 1431, 1437 (C.D.Cal. 1990); Northwest Airlines, Inc. v. Globe Indem. Co., [303 Minn. 16], 225 N.W.2d 831 (Minn. 1975); Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 784 P.2d 507, 514 (1990).
The Appellate Division continued, Id., 258 N.J. Super. at 209, 609 A.2d 440:
Within this analytical framework, we question whether the exception to the normal rule was properly applied in this case. Despite Diamond's sophistication, the critical fact remains that the policy in question was a standard form policy prepared by Aetna's experts, with language selected by the insurer. The specific language contained in the exclusion was not negotiated. It appears in policies issued to big and small businesses throughout the country. The use of standard policy provisions is founded upon the premises that collaboration *558 among casualty insurers is necessary to calculate and maintain reasonable rates. It has been said that "unless companies combining loss experience statistics afford[] substantially the same coverage, the reported statistics [will] vary from minor distortions of true experience to an almost meaningless potpourri." James B. Dovvan, Hardy Perennials of Insurance Contract Litigation, Ins. L.J. 163 (March 1954). It would seem that the benefits of this standardization would be lost if standard form language were given different meanings for different insureds based upon individual degrees of sophistication and bargaining power.
Having concluded that the phrase "accident" is equivalent to an "unforeseen" or "unexpected event," it is axiomatic that contamination and resulting damage which is intended or expected cannot constitute an "accident" which triggers an insurable event.
In Broadwell, supra, 218 N.J. Super. at 523-533, 528 A.2d 76, the Appellate Division concluded that a volitional act by the insured qualifies as an "accident" when the insured did not specifically "intend to cause the resulting harm or [was] not substantially certain such harm w[ould] occur." Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 469 N.E.2d. 797, 799 (Sup.Jud.Ct. 1984). This same concept has been specifically adopted by our Supreme Court. Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 607 A.2d 1255 (1992); SL Industries, Inc. v. American Motorists Ins. Co., 128 N.J. 188, 607 A.2d 1266 (1992).
Peripherally, the court must address the issue of burden of proof. In this respect there is a clear distinction when one compares the word "accident" in an insurance policy without definition, and the word "occurrence" in an insurance policy containing a definition.
The standard "occurrence" definition defines the insured event as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured." 3 Long, The Law of Liability Insurance, App.-53 (1966). By the inclusion of the phrase "neither expected or intended" within the definition of the insured event, the contractual *559 language imposes a burden upon the insured to establish that its claim for indemnity is predicated upon an "unexpected" event.
The typical pollution exclusion clause, as cited in Broadwell, supra, 218 N.J. Super. at 521, 528 A.2d 76, provides:
This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
As an exclusion from coverage, the burden of proof clearly rests with the insurer, and once that exclusion is posed, the insured is provided with a defense, to wit, that the exclusion is not applicable, as the loss was occasioned by a "sudden and accidental" discharge of contaminants or pollutants. Burd v. Sussex Mutual Ins. Co., supra.
Although the court, here, and as cited in Broadwell, id., has defined "accident" as an unexpected happening without intention or design, the court's interpretation cannot rise to the level of a contractual provision which specifically creates a prerequisite of proof to be affirmatively established by the insured. To do so would require the insured to prove a negative rather than to defend against the insurer's evidence that the alleged loss was the result of intended action and thus not an accidental event. This shift in the burden of proof on this issue is attributable to the ambiguity of the term "accident." This ambiguity is attributable to the insurer and thus the onus of proof must rest with the insurer who created the ambiguity. Mazzilli v. Acc. and Cas. Ins. Co. of Winterthur, supra.
Although the parties seek a determination of the scope of proof which will be required to establish that contamination was the result of an intentional act, this court concludes that *560 such a declaration is inappropriate for resolution by summary judgment.[8]

EXTENT OF COVERAGE
Having concluded that the discharge of contaminants, if unexpected or unforeseen, without intention or design, will constitute an "accident" within the parameters of a comprehensive policy of liability insurance, where the phrase "accident" is otherwise undefined, the court has been asked to grant summary judgment on several other collateral issues affecting the extent of coverage.
Armstrong contends that as a matter of law each insurance policy in effect during any stage of the contamination-pollution process, between the accidental discharge of the contaminants and the ultimate manifestation or discovery of the resulting damage may be utilized for indemnification to the full extent of the available insurance coverage. The concept espoused is commonly known as the "continuous trigger" rule.
The theory of insurance coverage indemnification by the continuous trigger approach is fully articulated in Keene Corp. v. Ins. Co. of North America, 215 U.S.App.D.C. 156, 667 F.2d 1034 (D.C. Cir.1981), cert. den., 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), reh.'g denied, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982), to the effect that where an injury process is not a definite, discrete event, the extent of insurance coverage should encompass the continuous period from exposure to manifestation of damage. Although the concept was articulated in reference to "occurrence," there is no logical reason why that same concept is not equally applicable to an "accident."
*561 Like asbestos-related disease, a release of contaminants, the event which causes damage, may take place substantially before the manifestation of the ultimate injury. The effect of the initial contamination may continue undetected through many periods of insurance coverage and may manifest itself for the first time subsequent to any period that a particular insurer is providing insurance coverage to the property owner.
In Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at 1041, the court clearly held that "each insurer on the risk between the initial exposure and the manifestation of disease is liable." Additionally, id. at 1047, the court concluded, "inhalation exposure, exposure in residence, and manifestation all trigger coverage," and thus, id. at 1042, stated, "each insurer on the risk between the initial exposure and the manifestation of disease" is liable.
In Gottlieb v. Newark Ins. Co., 238 N.J. Super. 531, 570 A.2d 443 (App.Div. 1990), the court analyzed this theory in determining its applicability in New Jersey. The court concluded that the concept had been rejected in Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984) and in Doria v. Ins. Co. of North America, 210 N.J. Super. 67, 509 A.2d 220 (App.Div. 1986).
In Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., supra, our Supreme Court rejected the "exposure theory"[9] of insurance coverage in resolving an insurance policy coverage dispute between two possibly liable insurance carriers in a suit for personal injuries resulting from the negligent prescription of medicine.
*562 The Court, quoting from Muller Fuel Oil Co. v. Ins. Co. of North America, 95 N.J. Super. 564, 232 A.2d 168 (App.Div. 1967) stated:
As a general rule the time of the "occurrence" of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged. "The time of the accrual of the insured's liability is the determining factor, not the time of an event which ultimate results in liability." (citations omitted). (Id. at 578, 232 A.2d 168)....
The tort of negligence is not committed unless and until some damage is done. Therefore the important time factor, in determining insurance coverage where the basis of the claim is negligence, is the time when the damage has been suffered.
(Id. at 579, 232 A.2d 168). (emphasis added).
The Supreme Court did not actually reject the "exposure approach" to insurance coverage in all disputes; in fact, it recognized the applicability of the approach in asbestosis cases. The Court's rejection of the "exposure theory" in Hartford, appears to have been based upon three factors: (1) allegations of negligence as a prerequisite to recover; (2) the specific insurance policy language requiring proof of bodily injury during the policy period; (3) failure on the part of Hartford to establish any factual foundation as to when the bodily injury occurred.
The Supreme Court concluded, id., 98 N.J. at 28, 483 A.2d 402,
... the courts which have endorsed the "exposure" theory in the asbestosis cases have not said that the mere exposure to a substance is a "bodily injury." That would be an untenable distortion of the policy language. Rather those courts have concluded from medical testimony that the inhalation of asbestos causes immediate tissue damage, although the effects of that damage do not immediately manifest themselves, and that such tissue damage is a "bodily injury."
Armstrong's liability to ACNN, Kerr Glass or to the DEP does not rest upon a negligence theory, nor on a determination of the meaning of "bodily injury." It rests on a determination of the meaning of "accident" and the coverage to be provided for losses resulting from "accident."
*563 The court in Gottlieb v. Newark Ins. Co., supra, also referred to Doria v. Ins. Co. of North America, 210 N.J. Super. 67, 509 A.2d 220 (App.Div. 1986) as an example of the judicial rejection of the "continuous trigger" or "exposure" approach to insurance coverage; however, an analysis of Doria, reflects that the court was essentially concerned with an issue of whether two personal injury claims arose from one "occurrence" or whether each claim constituted a separate "occurrence." The court in Doria, id. did not specifically discuss the "exposure" approach to insurance coverage or the "continuous trigger" concept either synonymously or as an alternative distinct theory.
The court in Gottlieb v. Newark Ins. Co., supra, emphasized that the Federal District Court for New Jersey had applied the "continuous trigger" theory in Sandoz, Inc. v. Employer's Liability Assurance Corp., 554 F. Supp. 257 (D.N.J. 1983) and in Lac D'Amiante Du Quebec v. Am. Home Assur. Co., 613 F. Supp. 1549 (D.C.N.J. 1985), and it therefore concluded that the "continuous trigger" concept was applicable in our courts, although it also indicated that the applicability of the theory may be fact sensitive. The theory was utilized by the court in reaching its ultimate conclusion.
The fact that certain fact sensitive issues may exist in this case which may warrant a plenary hearing does not preclude this court from concluding, as a matter of law, what legal theory will constitute the cornerstone of the factual analysis at a plenary hearing.
Consistent with the "continuous trigger" approach, where the damage which is ultimately discovered after a pollution accident is a direct result of the initial contamination, all insurance coverage existent during the period that the contaminant proliferates should be utilizable to indemnify the insured. The "continuous trigger" concept of insurance coverage recognizes that it is probably impossible to ascribe damage to any particular policy year in the damage proliferation process, and *564 thus, the entirety of insurance coverage existent during the years of proliferation, should be available for indemnification. If damages, once physically discovered, and remediation expenses, once calculated, are the terminus in ascertaining an insurer's responsibility, then the initial pollution incident, when deemed an "accident," is clearly the beginning point in ascertaining an insurer's ultimate responsibility. More important in this case, under the "continuous trigger" approach to insurance coverage, an insurer who insures property after the contamination process has already commenced may not escape liability for insurance indemnification. Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d at 1046-1049.
Obviously in this case, Armstrong must prove that an accident occurred and the damages resulting therefrom, and must prove as well that the damages continued during each policy period during which it was a named insured. The exact mathematical calculation and a determination of Reliance's share for indemnification requires a plenary hearing, for not only is the financial amount of damage fact sensitive, but the existence and the effect of other policies of liability insurance must also be explored.[10]
As previously indicated, the insurance policies each contain two identical exclusions: (a) owned-property exclusion; (b) contractual liability exclusion. For the reasons expressed, neither exclusion is applicable to this litigation.

OWNED-PROPERTY EXCLUSION
The pertinent language of the insuring agreement applicable to this issue is:

*565 This policy does not apply ... to injury to or destruction of (1) property owned, occupied by or used by or rented to the insured, or (2) except with respect to liability under sidetrack agreements and the use of elevators or escalators, property in the care, custody or control of the insured, or (3) any goods or products manufactured, sold, handled or distributed or premiums eliminated by the named insured or work completed by or for the named insured, out of which the accident arises.
It is plaintiff's position that the "owned property" exclusion will not apply, if the cleanup measures ordered at the site and performed upon the insured site were designed to prevent actual and threatened harm to third-party property.
In considering this agreement, we commence by affirmatively stating what these insurance policies do in fact insure. Simply stated, the policy coverage does apply to injury to or destruction of property not owned, or occupied by, or rented to the insured, arising from an accident.
However, as was stated in Broadwell, supra, 218 N.J. Super. at 525, 528 A.2d 76, in the context of an "occurrence" based policy,
"We hold that the costs of preventive measures taken by Broadwell on its own property in response to the DEP directive which were designed to abate the continued flow of contaminants on to adjacent lands are recoverable under the policy."
Additionally, Id., at 528-529, 528 A.2d 76,
"To the extent that all or a portion of the response expenses pertain solely to damage to the Broadwell site itself and not to prevent off-site contamination, the owned-property exclusion clearly applies, and such damage is not within the coverage provided." (emphasis added).
The terminology contained within these insurance policies is clear and unambiguous.

COVERAGE C  PROPERTY DAMAGE LIABILITY
"... [The insurer agrees T]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including loss of use thereof, caused by accident."
Abatement measures designed to prevent the continued destruction of adjacent property are plainly compensable, even if *566 these expenses are incurred on the insured property when incurred in response to a DEP directive.
Although the insurance contract only clearly covers payments to third persons asserting a claim for damages for injuries or destruction of property, it is clear that those expenses incurred to discharge legal obligations imposed or threatened by the DEP are deemed expenses designed to avoid anticipated damage to third parties. Additionally, it is judicially recognized that the DEP, as a state agency, acts pursuant to its parens patriae authority to abate damage to third parties and to property owned by or controlled by the state. Broadwell, supra, 218 N.J. Super. at 526, 528 A.2d 76; CPS Chemical Co. v. Continental Ins. Co., 222 N.J. Super. 175, 182-183, 536 A.2d 311 (App.Div. 1988).
Additionally, it must be noted that defendant's claim for indemnification does not rest solely upon expenses incurred pursuant to DEP directive, but includes claims for contribution asserted by Kerr in litigation instituted by ANCC in the United States District Court for the Northern District of Illinois in which Armstrong was named as an additional defendant.
Thus, the expenses which are reimbursable are both expenses incurred pursuant to a settlement of the aforementioned litigation instituted by a third-party claimant and those expenses separately incurred or to be incurred as a direct result of governmental action designed to prevent future anticipated property damage claims. As stated, expenses incurred solely on the Kerr Glass site itself which were not incurred to prevent off-site contamination are not reimbursable as they fall within the ambit of the unambiguous property exclusion provisions of the insurance coverage. Broadwell, supra, 218 N.J. Super. at 530, 528 A.2d 76. This ruling is consistent with In re Adoption of N.J.A.C. 7:26 B, 128 N.J. 442, 608 A.2d 288 (1992).
The exact extent of this liability is not before this court on these motions for summary judgment. After full discovery, these issues will be addressed at trial.

*567 CONTRACTUAL LIABILITY EXCLUSION
"This policy does not apply ... to liability assumed by the insured under any contract or agreement except ... a contract as defined herein."
The insurance agreement provides the following definition of "contract."
"A warranty of goods or products or, if in writing, a lease or premises, easement agreement, agreement required by municipal ordinance, sidetract agreement, or elevator or escalator maintenance agreement."
The specific contract which must be analyzed is the sales agreement controlling the conveyance by plaintiff Kerr Glass in 1969 which provided:
Armstrong agrees to indemnify and hold harmless from and against any damage or loss suffered by Kerr as a result of ... any claim of any kind or nature whatsoever with respect to the business carried on by Armstrong's Packaging Materials Operations arising out of facts or events occurring prior to the closing time.
Reliance asserts that all claims arising from the ANCC litigation are excludable by the terms of the insurance agreement by virtue of the contractual arrangement between plaintiff and Kerr Glass.
In the ANCC litigation, Armstrong was sued by Kerr Glass under several theories, including, liability under CERCLA, liability under the indemnity provision of the contract of sale, liability under a theory of strict liability, and liability under a theory of unjust enrichment.
Although the specific sales agreement between Armstrong and Kerr Glass was referred to as a basis of liability, the claims under each theory were intermixed and undifferentiated. In fact, the ultimate settlement of the ANCC litigation did not allocate or differentiate theories of liability.
The position of Reliance is obvious: Does the fact that the ANCC litigation specifically included counts seeking damages arising from the indemnity provision of the contract of sale between Armstrong and Kerr Glass negate any responsibility of Reliance herein for indemnification under its insurance contact with Armstrong?
*568 This very issue was thoroughly analyzed in Karadis Bros. Painting Co. v. Pennsylvania Nat'l Mut. Cas. Ins. Co., 119 N.J. Super. 446, 292 A.2d 42 (Ch.Div. 1972), in which the court stated:
It is not unusual for liability insurance policies to exclude from coverage liability assumed by an insured under a contract not defined in the policy, generally one in which the insured agrees to indemnify to save harmless a third party.
... However, the exclusion clause does not preclude coverage, even though some sort of liability is assumed by contract, where the insured would have been liable regardless of his contractual undertaking. (citations omitted).
... Liability assumed by a contract not defined in the policy is excluded from coverage under such exclusion clause where the contractual obligation was one which would not have been independently imposed upon him by law. (citations omitted).
Id. at 451-452, 292 A.2d 42.
These general principles are correct statements of the prevailing judicial authority as it relates to the issue raised by Armstrong. See Annotation, Scope and Effect of Clause in Liability Excluding from Coverage Liability Assumed by Insured Under Contract Not Defined in Policy, Such As One of Indemnity, 63 A.L.R.2d 1122.
From the stipulated facts presented on these motions for summary judgment, it is clear that all expenses incurred by Armstrong as a result of the ANCC litigation fall within ambit of CERCLA, which imposes strict joint and several liability on a former owner or operator of contaminated property, including the total costs of investigation and remediation. 42 U.S.C.A. § 9607(a).
Thus, apart from the contract of sale between Armstrong and Kerr Glass and the indemnity provisions contained therein, Armstrong was potentially liable to Kerr Glass, and thereafter to ANCC for the investigation and remediation of contamination pursuant to 42 U.S.C.A. § 9607(a).
Reliance, in response to the Armstrong cross motion, has failed to assert any factual basis to support the concept that any sum which Armstrong agreed to pay to ANCC was beyond *569 the scope of any liability sought to be imposed under CERCLA. Thus, although Kerr originally, and thereafter ANCC, asserted claims seeking compensation under alternative theories, there is no evidence presented on this motion which would permit this court to infer that Armstrong's liability would not have been the same had ANCC only asserted its claim under the CERCLA statutory scheme. Thus there are no disputable issues of material fact which require discovery or a plenary hearing and summary judgment is clearly appropriate. R. 4:46-2. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954).

CONCLUSION
For the reasons expressed, each motion before this court has been granted in part and where denied, a plenary trial will ultimately, after full discovery, be conducted to resolve those remaining issues. The parties shall concur in drafting an appropriate order and to separately prepare a proposed discovery schedule subject to future judicial management.
NOTES
[1] Reliance seeks, in the alternative, an order vacating a prior case management order temporarily barring discovery pending the disposition of these cross motions for summary judgment.
[2] By stipulation, before this court, the settlement agreement has been filed under seal pursuant to R. 1:38(e). Armstrong's responsibilities were not allocated as to contractual obligations or as to its CERCLA liability.
[3] The parties have submitted to this court portions of the record in litigation entitled, In re Asbestos Ins. Coverage Cases, Judicial Council Coord. Proceeding No. 1072 (Cal.Super.Ct. San Fran. Cty.) involving among other parties, both Armstrong and Reliance. The California litigation was divided into phases and culminated in the issuance of a decision on January 1, 1990, entitled "Statement of Reasons for decision concerning the existence and terms of policies issued by Reliance to Armstrong (Phase I)."

Phase I of that litigation was devoted to a resolution of a dispute as to the existence and terms of insurance contracts.
Because of the importance of the ruling of the California Court to this declaratory judgment action, paragraphs 1-6 of that ruling, entered by stipulation, are quoted specifically within this footnote.
Accordingly, the Court hereby finds:
1. Standard Accident Insurance Company ("Standard Accident") was a predecessor of Reliance. Armstrong Cork Company changed its name to Armstrong World Industries, Inc., on May 15, 1980. Any policy issued by Standard Accident to Armstrong Cork Company is a policy issued by Reliance to Armstrong.
2. Armstrong has withdrawn its claims for Standard Accident liability insurance coverage to Armstrong for periods prior to January 1, 1942, and the Court, therefore, determines that there is no such coverage.
3. Standard Accident issued ten consecutive twelve-month liability insurance policies to Armstrong during the period 12:01 A.M. January 1, 1942, to 12:01 A.M. January 1, 1952.
4. Except as otherwise indicated herein, the complete contents and terms of the policy issued by Standard Accident to Armstrong for Calendar Year 1951 are set forth in the policy attached hereto as Exhibit "1." Further, the typed-in subparagraph "(A)" under Item 5 on page one of Exhibit "1" is deleted and of no force and effect. In addition, the 1951 policy contains an endorsement, the terms of which are identical to the preprinted terms in the endorsement attached hereto as Exhibit "2."
5. Each of the nine policies issued by Standard Accident to Armstrong during the period 12:01 A.M. January 1, 1942, to 12:01 A.M. January 1, 1951, is either identical to or not materially different from Exhibit "3" attached to this statement of reasons for decision, and, except as hereinafter set forth, the terms of the insurance policies for the period January 1, 1942, to January 1, 1951, are as set forth in Exhibit "3" hereto.
6. Only one policy was issued by Standard Accident to Armstrong for each of the ten consecutive policy periods. Each of the ten policies in effect from 1942 through 1951 insured the premises-operations hazard for all operations and premises in the United States. Each of the ten policies in effect from 1942 through 1951 insured the products hazard including all asbestos-containing products and all completed operations involving the use of asbestos. Each policy covers Armstrong's activities falling within the premises-operations and products hazards only throughout the United States. Nothing in this paragraph shall affect Insuring Agreement IV on page two of each of the ten policies.
[4] Where appropriate the specific policy language deemed existent by the California Court will be quoted in its entirety within this opinion.
[5] This court need not address the issue of applicability of the argument that a duty to defend is broader than a duty to pay, as discussed in Hartford Ins. Group v. Marson Constr. Corp., 186 N.J. Super. 253, 257, 452 A.2d 473 (App.Div. 1982), certif. denied, 93 N.J. 247, 460 A.2d 656 (1983); Ohio Casualty Ins. Co. v. Flanagin, 44 N.J. 504, 512, 210 A.2d 221 (1965); West v. MacDonald, 103 N.J. Super. 201, 247 A.2d 20 (1967), aff'd o.b., 52 N.J. 536, 247 A.2d 129 (1968). The disposition of that issue, if asserted, must await a plenary hearing.
[6] For reasons previously expressed, Armstrong's motion as to defense expenses is premature and must be denied without prejudice.
[7] See also: Webster's Third New International Dictionary 11 (1986); The Random House Dictionary of the English Language 9 (1973); Webster's New Collegiate Dictionary (1945); Shorter Oxford English Dictionary (1939); Funk and Wagnalls New Practical Standard Dictionary, 1946.
[8] This issue is presently before our Supreme Court in Morton International, Inc. v. General Accident Insurance Company, certif. granted, 127 N.J. 563, 606 A.2d 374 (1992).
[9] Although the term "exposure theory" and "continuous trigger" theory appear to be used synonymously, the terms are not interchangeable, e.g. See Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co., 613 F. Supp. 1549, 1555 (D.C.N.J. 1985) and actually constitute two distinct theories of coverage.
[10] The court notes that Whitall-Tatum was not a named insured in the Reliance insurance policies. The court's ruling does not resolve the question of whether the pollution emanated from acts during Whitall-Tatum's ownership, or from acts attributable to Armstrong prior to the onset of Reliance's coverage, when Armstrong may have been uninsured or insured by other insurance carriers. The proofs to be presented will affect the extent of indemnification attributable to Reliance.