The **CONTINENTAL INSURANCE COMPANY**, Plaintiff,

v.

**BEECHAM, INC.**, Defendant.

Civ. A. No. 88-2890(MTB).

United States District Court, D. New Jersey.

Aug. 31, 1993.

Bumgardner, Hardin & Ellis, P.C. by Janet L. Poletto, Springfield, NJ, Carr, Goodson & Lee, P.C. by Lawrence E. Carr, Jr., Washington, DC, for plaintiff.

Lowenstein, Sandler, Kohl, Fisher & Boylan by Michael Dore, Roseland, NJ, for defendant.

## *OPINION*

BARRY, District Judge.

### I. Introduction

This action involves an insurance coverage dispute between Beecham, Inc. ("Beecham") and its insurer, the Continental Insurance Company ("Continental"), with respect to the environmental contamination of a facility in Myerstown, Pennsylvania previously owned by Beecham. Presently before the court are cross-motions for summary judgment for declaratory relief concerning the rights and liabilities under the contracts of insurance entered into by the parties, which motions, almost by definition, raise a plethora of issues.

On an initial consideration of the motions but prior to this opinion, the court concluded that with respect to the parties' dispute as to whether the substantive law of Pennsylvania or New Jersey should be applied to this dispute, New Jersey law would govern. At the time the court made this determination, one of the central issues in this litigation, i.e. the meaning and interpretation to be given the "pollution exclusion" clause in the insurance policies at issue here, was before the Supreme Court of New Jersey in *Morton International, Inc. v. General Accident Ins. Co. of America.* Accordingly, by letter dated March 5, 1993, the court advised the parties that the choice of law determination had been made, that New Jersey law would be applied, and that the court would await the decision of the Supreme Court in *Morton* before determining the substantive issues in this litigation. That case now having been decided by the Supreme Court, this court reaffirms its initial conclusion that New Jersey law applies and considers the remaining issues in light of *Morton.* For the reasons which follow, Continental's motion for summary judgment will be denied and Beecham's cross-motion for summary judgment will be granted in part and denied in part.

## II. Factual and Procedural History

### A. The Myerstown Site Prior to Beecham's Ownership

The site of the contamination at issue is a 22 acre plant in Myerstown, Pennsylvania owned by Whitmoyer Laboratories, Inc. ("Whitmoyer"), an animal pharmaceutical company founded in 1934. Final Pretrial Order Stipulation of Facts (hereinafter "Stip.") ¶ 3; Plaintiff's Appendix in Support of Motion for Summary Judgment (hereinafter "Pl.App.") 2 at 1–4; Pl.App. 3 at B10361. In 1957, Whitmoyer began producing arsenic-based feed additives for animals. Pl.App. 2 at 1–4; Defendant's Appendix in Support of Motion for Summary Judgment (hereinafter "Def.App.") 2 at 1–4. In 1964, Whitmoyer was purchased by and became a wholly-owned subsidiary of Rohm & Haas Company. Stip. ¶ 8.

Shortly after Rohm & Haas acquired Whitmoyer, arsenic pollution was discovered in the soil and groundwater at the Myerstown plant. Pl.App. 2 at 1–6; Pl.App. 5 at R00002323; Def.App. 2 at 1–6; Def.App. 3 at R00368. Prior to 1964, Whitmoyer had loaded arsenic waste materials from the production of arsenical onto tanker trucks and transported the materials to an on-site lagoon where they were dumped. Stip. ¶ 6. In addition, as of 1963 the site had a sludge pile approximately 25 feet in diameter consisting of DDAA. Stip. ¶ 7.

Following the discovery of arsenic pollution, and under the guidance of Pennsylvania's Department of Health, Rohm & Haas began a remediation effort at the plant. Stip. ¶ 16. The remediation plan included, among other things, the termination of wastewater disposal in the lagoon and the excavation of lagoon sludges, groundwater pumping and treatment, and the provision of bottled water to the nearby residents with contaminated wells. Pl.App. 2 at 1–6; Def. App. 2 at 1–6. Rohm & Haas constructed an internal dike around the building in which arsenic production took place and placed sealing mechanisms on storm drains which flowed into Tulpehocken Creek so that they could be closed in the event of a spill. Dengler Dep.[1], Def.App. 4 at 31; Stip. ¶¶ 5, 18. It constructed, as well, a concrete "vault," approximately 123 feet long, 83 feet wide, and 12 feet deep into which arsenic contaminated soil, the calcium arsenate from the lagoon, and other materials were placed, sealed, and "entombed." Pl.App. 2 at 1–6; Def.App. 2 at 1–6; Dengler Dep., Pl.App. 6 and Def.App. 4 at 38; Pl.App. 9 at B10072; Stip. ¶ 19. Monitoring and treatment wells were installed around the plant to facilitate groundwater testing and analysis and to prevent the flow of contaminants off the property. Def.App. 5 at 2; Croesus Dep., Pl.App. 8 at 334; Pl.App. 9 at B10072. The material in the sludge pile was drummed and stored in a barn near the plant property to be sold for product reclamation. Dengler Dep., Def. App. 4 at 39, 45. In 1976 or 1977, additional

---

1. Depositions will be referred to by the deponent's name followed by "Dep." and the location of the particular pages referenced will be identified by the appendix number at which those pages appear.

arsenic waste was consolidated from all the lagoons into certain "consolidated" lagoons. Def.App. 2 at 1–6; Pl.App. 2 at 1–6; Pl.App. 7 at B10337–B10338. All of the lagoons were later covered with topsoil and seeded with grass. *Id.*; Stip. ¶ 24.

### B. Beecham's Acquisition of Whitmoyer from Rohm & Haas

On March 31, 1978, Beecham purchased the stock of Whitmoyer from Rohm & Haas. Certification of Albert J. White, dated February 28, 1982 (hereinafter "White Cert.") ¶ 2. Beecham's purchase of this stock was part of a larger transaction in which Beecham acquired various assets of Rohm & Haas located around the world. Of the total purchase price of $18.5 million, $13.1 million was attributable to the purchase of Whitmoyer's stock. *See* Certification of Albert J. White, dated February 28, 1992, Exh. A and Pl.App. 20 (hereinafter "Purchase Agreement") at B10602. As part of the Purchase Agreement, Rohm & Haas warranted that the property sold was in good condition and in compliance with all federal, state, and local laws. White Cert., Exh. A., at 32, 36. Continental points out that this warranty was general in nature and, in any event, could not have taken into consideration the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, which was not enacted until several years after the acquisition.

Prior to the Whitmoyer acquisition, Beecham representatives Fred Bledsoe and Robert McEntee [2] were taken on tours of the Myerstown plant and facilities. McEntee Dep., Pl.App. 12 at 31; Bledsoe Dep., Pl.App. 13 at 36; Ambrogi Dep., Pl.App. 4 at 117–120; King Dep., Pl.App. 16 at 22. These tours consisted of walking around the plant site to each of the production areas. King Dep., Pl.App. 16 at 24. Lloyd Croesus, Whitmoyer's Safety and Environmental Manager, testified that the subject of arsenic contamination at the plant was raised during a tour with Beecham representatives and that those representatives were informed not only that contamination had occurred prior to Rohm & Haas' purchase of the plant but that there was still some groundwater and soil arsenic contamination. Croesus Dep., Pl.App. 8 at 118–19. In addition, Whitmoyer's President, William Ambrogi, recalled discussing the history of the contamination problems at the plant "to convince [Beecham and Bledsoe in particular] that ... we were convinced that the problem was solved." Ambrogi Dep., Pl.App. 4 at 117. Continental also cites to a document entitled "Subjects for Discussion with R & H" which lists as a topic "Identity of Current and Potential EPA Problems." Pl.App. 18 at B10483.

Beecham attacks the cited portion of Croesus' testimony because he did not specify to whom at Beecham he spoke concerning the Myerstown facility's history of contamination.[3] Croesus Dep., Pl.App. 8 at 118–19. Moreover, all four Beecham employees who were substantially involved in the Whitmoyer acquisition, Bledsoe, McEntee, General Counsel, and Secretary Albert White, and Assistant Insurance Manager Paul Pfeffer, have denied that they were told about the arsenic contamination or the remediation efforts undertaken by Rohm & Haas at the Myerstown plant. *See* Certification of Fred Bledsoe, dated March 25, 1992, ¶¶ 3–4; Certification of Robert McEntee, dated March 25, 1992, ¶¶ 2–3; Certification of Albert J. White, Esq., dated March 25, 1992, ¶ 5; Certification of Paul Pfeffer, dated March 31, 1992, ¶ 4.

In support of its position that Rohm & Haas represented to it that the Myerstown

---

**2.** As of March 31, 1978, the date Beecham purchased the stock of Whitmoyer, Fred Bledsoe was the President of Beecham Laboratories, Vice President of Beecham, Inc., and a member of the Board of Directors of Beecham, Inc. Stip. ¶ 26. As of March 31, 1978, Robert McEntee was the President of the Finance Division of Beecham, Inc. and a member of Beecham Inc.'s Board of Directors. Stip. ¶ 25. Following the acquisition and during Beecham's ownership of Whitmoyer, Bledsoe was Whitmoyer's President and McEntee was Whitmoyer's Vice President and Treasurer. Stip. ¶ 30.

**3.** Indeed, Beecham generally attacks the credibility of Croesus. *See* Def.Opp.Br. at 5 n. 3. The court, of course, is not free to assess the credibility of witness' testimony in considering a motion for summary judgment.

plant had no environmental problems, Beecham points to the testimony of Fred Bledsoe that he was told that the Myerstown site had been inspected and approved by the Pennsylvania Department of Environmental Resources ("PADER"). Bledsoe Dep., Def. App. 51 at 39–41. In addition, Beecham cites to a portion of Bledsoe's handwritten notes from 1977: "Reported—the Myerstown Penna plant had been inspected by EPA, OSH, etc.—and no problems had been encountered." Def.App. 6 at B11543; Bledsoe Dep., Pl.Opp.App. 1 at 100. Continental counters that because the notations are from 1977, they are most likely from a preliminary stage of the acquisition talks and likely predate plant tours and other investigations undertaken by Beecham personnel.

Beecham also notes that the annual reports of Rohm & Haas for 1976 and 1977 disclose what they term as "less extensive" environmental efforts but fail to make mention of those efforts undertaken at the Myerstown facility. *See* Def.App. 7 at B04656B; Def.App. 8 at B04700B. Beecham asserts that the deposition testimony of William Ambrogi and Frantz Dengler supports its position that the absence of any reference to remediation efforts at the Myerstown plant is attributable to Rohm & Haas' belief that remediation had been successfully completed. Ambrogi Dep., Def.App. 9 at 45–47; Dengler Dep., Def.App. 4 at 74. Continental, on the other hand, argues that the testimony cited by Beecham relates only to the groundwater recovery program and that, even then, the program was terminated because it was seen as too costly and futile. Pl.Opp.Br. at 8.

Continental claims that, prior to the Whitmoyer acquisition, Beecham had knowledge of the bottled water program instituted by Rohm & Haas. Specifically, Continental points out that the Purchase Agreement refers to, under "Miscellaneous Agreements and Commitments," the "[v]erbal commitment of Whitmoyer Laboratories, Inc. to supply bottled water to persons near the Myerstown plant whose wells have been contaminated by the presence of arsanilic acid." Purchase Agreement at 16323. Lloyd Croesus testified that he received a request from Beecham personnel for a list of those persons to whom Whitmoyer was supplying bottled water as a result of arsenic contaminated wells. Croesus Dep., Pl.App. at 125. Beecham does not dispute the reference to these verbal commitments in the Purchase Agreement, although White, Beecham's General Counsel, claims that he did not see a copy of the Purchase Agreement with a reference to bottled water prior to signing the agreement. White admitted, however, that notes on the two pages following the reference to bottled water were in his handwriting. White Dep., Pl.App. 15 at 78–81.

Beecham does dispute the import to be drawn from Continental's claim that Beecham nearly scuttled the Whitmoyer purchase as a result of certain ecological problems. While it is undisputed that a September 20, 1977 letter from Beecham's Bledsoe to Ambrogi indicates that Beecham was not interested in acquiring the Whitmoyer Laboratories' part of Rohm & Haas' Animal Health Business, in part because it "believe[d] that potential ecological problems will arise," Beecham claims that Continental's use of this statement to support its argument that Beecham was aware of the arsenic contamination at the Myerstown facility is disingenuous. Pl.App. 22 at B10464. Indeed, the recipient of Bledsoe's letter, Ambrogi, testified that the reference to "ecological problems" in the sentence in question was limited to a tank full of waste in Paulsboro, New Jersey. Ambrogi Dep., Def.App. 41 at 123. Beecham urges that the exact opposite inference must be drawn from the statement concerning potential ecological problems: that Beecham's refusal to complete a deal which included the purchase of a waste tank it considered to be an ecological problem makes Continental's argument that Beecham bought Whitmoyer with knowledge of the arsenic contamination incredible. Beecham further notes that as a result of this concern, the Paulsboro waste tank was omitted from the Purchase Agreement. Purchase Agreement at B10601.

## C. The Operation of Whitmoyer under Beecham

After Beecham's acquisition of Whitmoyer, Whitmoyer employees Harold Huffman, Donald King, and Lloyd Croesus continued to

work at the plant. King became Operations Manager, to head Whitmoyer's Myerstown operations; Huffman moved from Area Manager to Plant Manager; and Croesus remained in his former position as Safety and Environmental Manager. Croesus Dep., Pl. App. 8 at 148–49. Beecham oversaw Whitmoyer operations through the Whitmoyer Operations Committee, which included Beecham employees William Hepburn and Robert Widerkehr. Pl.App. 35 at B05824B. The production of products containing arsenic continued at the site throughout the period when Whitmoyer was owned by Beecham. Pl. Rule 12(G) Statement ¶ 44; Def.Opp.Rule 12(G) Statement ¶ 44; Croesus Dep., Pl.App. 8 at 196.

Continental asserts that the arsenic contamination problem at the Myerstown plant was evident throughout Beecham's ownership of Whitmoyer. Throughout that period, i.e. from 1978 to 1982, Whitmoyer continued to supply bottled water to nearby residents whose wells were contaminated. Pl.Rule 12(G) Statement ¶ 37; Def.Opp.Rule 12(G) Statement ¶ 37. Lloyd Croesus testified that he saw cracks in the concrete vault and that he had a conversation with Harold Huffman about the possibility of setting up a monitoring system to determine if waste material was leaking out of the vault. Croesus Dep., Pl.App. 8 at 330. Moreover, Whitmoyer employees knew that arsenic was infiltrating the sewer system, suspecting that it was entering the system through cooling tower holding tanks, production facilities, and sink and shower rooms. Pl.App. 29 at EP0000049–0000051.

Beecham admits that in July, 1978, the PADER threatened to issue an injunction suspending the Myerstown plant's operations due to excessive arsenic emissions into the air. Pl.App. 37 at B10943. While no injunction was ever issued, Whitmoyer was fined $6,500 in October, 1978 for unauthorized modification of the arsenic waste evaporation system, failure to list all air contaminants, failure to operate the system in accordance with the operation permit, and operation of the system in a manner that caused air pollution. Stip. ¶ 32; Pl.App. 38 at B10992–B10995. That same year Whitmoyer also settled a claim with an adjacent land owner concerning crop damage allegedly caused by arsenic pollution. Pl.App. 39 at B11015; Def.Opp. Rule 12(G) Statement ¶ 45; Croesus Dep., Pl.App. 8 at 471–72. It is admitted, too, that in 1982 Whitmoyer was fined $3,200 for exceeding the permitted volume discharge level, although the parties dispute the significance of such a violation. Stip. ¶ 34; Pl.Rule 12(G) Statement ¶ 40; Def. Opp.Rule 12(G) Statement ¶ 40.

In 1979, Buckeye Pipeline Company uncovered some arsenical materials during an excavation to repair a pipeline. Pl.App. 31 at B12237–B12238. A dump of approximately forty feet by thirty feet by seven feet deep was discovered. *Id.* Two attorneys employed by Beecham, Robert Frawley and Larry Olon, visited the site and reviewed the situation. *Id.*; Frawley Dep., Pl.App. 32 at 27–30. In an effort to limit its liability from the toxic material that was not properly contained, Beecham authorized approximately $70,000 to clean up the area. Pl.App. 31 at B12237–B12238; Croesus Dep., Pl.App. 8 at 267. The Whitmoyer Operations Committee also considered whether to remove the waste stored in the concrete vault, opting not to do so. Pl.App. 35 at B05829B. Whitmoyer Operations Committee members Anthony Bott and Leroy Kauffman testified that this decision was based on the belief of the committee members that the concrete vault was adequately sealed. Bott Dep., Def.App. 39 at 38; Kauffman Dep., Def.App. 40 at 62.

On May 4, 1982, Beecham sold Whitmoyer, with the exception of the Affiliated Laboratories division located in Illinois, to Stafford Laboratories, Inc. for $4 million. Pl.App. 42 at 2. In February, 1984, the United States Environmental Protection Agency ("EPA") found elevated levels of arsenic in the groundwater and sediment. The site was proposed for the National Priorities List of potentially hazardous waste sites, pursuant to CERCLA section 105(8)(B), 42 U.S.C. § 9605(8)(B), in October, 1984 and finalized on the list in June, 1986. Pl.App. 2 at 1–7; Def.App. 2 at 1–7. In April, 1986, Beecham was notified by the PADER that it was a potentially responsible party ("PRP") with respect to contamination at the Myerstown

site. Def.App. 20. Shortly thereafter, Beecham notified Continental of its claim. Def. App. 20.

### D. Beecham's Contracts of Insurance with Continental

Continental first issued Comprehensive General Liability ("CGL") policies to Beecham in 1976 and issued subsequent policies providing coverage for the years through 1985. Stip. ¶ 38. In 1978, Whitmoyer was added as an additional insured under the CGL policies. Stip. ¶ 41. Under the terms of these policies, Continental agreed to pay "all sums which the insured shall become legally obligated to pay as damages because of ... property damage caused by an occurrence" during the policy period. An "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." The policies also contain a "pollution exclusion" clause which states that:

> This insurance does not apply ... (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals or pollutants into or upon land, the atmosphere, or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Stip. ¶ 38.

The policies from 1977 to 1986, and the 1976 policy as of August 24, 1976, contain an endorsement entitled "Knowledge of Occurrence" which states that: "It is agreed that in the event of any occurrence written notice shall be given [sic] by or on behalf of the insured to the company or any of its authorized agents as soon as practicable after knowledge thereof by the insurance manager, any corporate attorney or officer of the corporation." Stip. ¶ 39. In addition, the policies covering 1976 to 1986 contain an endorsement stating that: "It is agreed that failure of the named insured to disclose all hazards existing at the effective date of the policy shall not prejudice the insured with respect to the insurance afforded by this policy if such failure is not intentional." Stip. ¶ 53.

In connection with the policy in effect from April 1, 1977 to April 1, 1978, policy number L1416312, Continental issued a Retrospective Agreement according to which policy premiums were calculated. Stip. ¶ 44. This document allowed Continental to impose retrospective premiums for losses covered by the subject policy. Stip. ¶ 45.

### III. Choice of Law

■■ As an initial matter, the court must determine which state's substantive law is to be applied to the dispute concerning the interpretation of the contract of insurance between Continental and Beecham. Because this action was brought initially in the Middle District of Pennsylvania and transferred to this court pursuant to 28 U.S.C. § 1401(a), *see Continental Ins. Co. v. Beecham, Inc.,* No. 87–1275 (M.D.Pa. February 25, 1988) (report and recommendation of the magistrate judge) (Def.App. 22); *Continental Ins. Co. v. Beecham, Inc.,* No. 87–1275, 1988 WL 168564 (M.D.Pa. June 24, 1988) (memorandum opinion and order of the district judge adopting the report and recommendation of the magistrate judge) (Def.App. 23), the court must apply the choice of law rules that the transferor court, the Middle District of Pennsylvania, would have applied. *See Ferens v. John Deere Co.,* 494 U.S. 516, 531, 110 S.Ct. 1274, 1283, 108 L.Ed.2d 443 (1990); *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964). Because the Middle District of Pennsylvania would have been bound, as are all federal courts sitting in diversity, to apply the choice of law rules of the state in which it is located, this court must apply the choice of law rules of Pennsylvania. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269 (3d Cir. 1988). Continental argues in favor of the application of Pennsylvania substantive law, while Beecham contends that New Jersey law should govern.

In *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 21, 203 A.2d 796 (1964), the Supreme Court of Pennsylvania abandoned its outmod-

ed strict *lex loci delicti* rule "in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *See also Melville v. American Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir.1978) (holding that Pennsylvania would extend the *Griffith* approach to contract actions); *United Brass Works, Inc. v. American Guarantee and Liability Ins. Co.*, 819 F.Supp. 465, 468 (W.D.Pa. 1992). Pennsylvania's current rule has been interpreted as encompassing both the significant contact analysis of the Restatement (Second) of Conflict of Laws and an analysis of the interests and policies asserted by each jurisdiction. *Compagnie des Bauxites de Guinee v. Argonaut–Midwest Ins. Co.*, 880 F.2d 685, 689 (3d Cir.1989). Thus, the court must "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the issue." *Shields v. Consolidated Rail Corp.*, 810 F.2d 397, 400 (3d Cir.1987).

 Parenthetically, Beecham argues that the report and recommendation of the magistrate judge and the subsequent memorandum opinion of the district judge in the Middle District of Pennsylvania constitute law of the case as to the choice of law issue now before the court. This argument must be rejected out of hand. First of all, it is axiomatic that the doctrine of law of the case is binding only as to issues actually addressed and decided or decided by necessary implication. *See Bridge v. U.S. Parole Comm'n*, 981 F.2d 97, 102 (3d Cir.1992); *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984); *Todd & Co. v. Securities & Exchange Commission*, 637 F.2d 154, 157 (3d Cir.1980). The motion before the magistrate judge, and later the district judge, in the Middle District of Pennsylvania was a motion to transfer pursuant to 28 U.S.C. § 1404(a). While the substantive law which will be applied in an action is a factor for consideration in a § 1404(a) analysis, it is but one of a number of considerations to be weighed in what is, ultimately, a determination of whether private and public interests warrant the transfer of an action. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The transferor court did not presume to decide the choice of

law issue and the remarks of both the magistrate judge and the district judge reflect as much. *Leksi, Inc. v. Federal Ins. Co.*, 736 F.Supp. 1331, 1333 (D.N.J.1990) (another court's decision on a motion to transfer under section 1404(a) is not deemed an actual determination of what substantive law should apply); *Continental Ins. Co. v. Beecham, Inc.*, No. 87–1275, slip op. at 8, 10, 1988 WL 168564 (M.D.Pa. June 24, 1988) (memorandum opinion and order of the district judge) ("the magistrate concluded based on a preliminary review of choice of law principles …" and "we need not determine the ultimate outcome of [the choice of law] issue at this stage of the proceedings"). Furthermore, the motion to transfer was made over four years ago on a record which was obviously not complete. Fairness and accuracy mandate that this court determine the choice of law issue *de novo* on the record before it.

### A. Contacts Analysis

#### 1. Restatement Section 193

 As part of *Griffith*'s hybrid analysis, the court must consider the contacts with Pennsylvania and New Jersey. The court in *Griffith* looked for guidance in its assessment of relevant contacts to the Restatement (Second) of Conflict of Laws section 379(2) (hereinafter "Restatement"), which relates to tort actions. Accordingly, because this is a contract action, it is appropriate that this court look to those sections of the Restatement which apply to contract actions.

Continental argues that section 193 should govern the contacts analysis here. That section, entitled "Contracts of Fire, Surety or Casualty Insurance," provides that the validity of such a contract is to be determined according to "the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some *other* state has a *more* significant relationship under the principles in § 6 to the transaction and the parties, in which event the local law of the other state will be applied." Restatement § 193. Citing both case law and comments to the Restate-

ment, Continental urges the court to follow section 193.

Continental's argument, however, is flawed. The application of section 193 depends upon an understanding between the parties as to the "principal location of the insured risk." Restatement § 193. The comments to the section make clear that "[t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law *provided that the risk can be allocated, at least principally, in a single state.*" Restatement § 193, comment b (emphasis added). The comment cites two examples of when the risk will not be allocable to a single state: where the insured object will move from state to state and where the policy covers a group of risks that are scattered in two or more states. *Id.*

Continental does not suggest that there was an explicit understanding between itself and Beecham that the principal location of the insured risk was Pennsylvania. Rather, it argues that section 193 dictates that Pennsylvania law apply "for the simple reason that the insured's liability in the underlying action arises from a risk located in that State." Pl.Br. in Support of Summary Judgment at 20. Continental errs, however, in focusing on where the liability arose rather than where the risk or risks which were the subject of the contract of insurance were located. In other words, the relevant consideration is the location of the risks covered by the contract at the time the contract was entered into and throughout the term of the contract, not where any given insured risk came to fruition.

Whitmoyer was added to Beecham's CGL policy with Continental as an additional insured after the acquisition in 1978. Included as additional insureds under that contract, in addition to Beecham's operations in New Jersey, were the Affiliated Laboratories Division of Whitmoyer, located in Illinois, as well as other businesses located in California and Tennessee. Def.App. 27. It is obvious that the risks covered by the CGL policies at issue extended far beyond merely the risk presented by the Whitmoyer site in Myerstown, Pennsylvania. The nature of the con-

tract, therefore, was such that the risk or risks could not be allocated principally to one state.

That the terms of section 193 are not applicable in instances in which the risks covered by a contract of insurance are dispersed in more than one state is made abundantly clear not only by comment b, but also by comment f and by case law considering such instances. Comment b states that where the risk cannot be principally allocated to one state, the location of the insured risk "has less significance." Restatement § 193, comment b. Comment f, applicable to multiple risk policies, states that such a policy may be treated as if it is more than one policy, with the law of the state where each risk is located to be applied to any dispute concerning that risk. By its very terms, however, comment f is of limited scope. It applies only to policies covering risks for which a state requires a particular statutory form, typically fire insurance policies, which form will generally be incorporated into the policy. *Id.*, comment f. Comment f states that at least the part of the policy which incorporates the form of a particular state will be construed in accordance with that state's rules. *Id.* Because the CGL policy at issue, or at least those parts of it relevant to this action, are not of the ilk contemplated by comment f, the policy will not be treated as more than one policy.

The conclusion that section 193 has no application where the risks insured are scattered is consistent with the case law. The Third Circuit has reached a similar conclusion, albeit in the context of an insured object which was a movable piece of equipment. *See Compagnie des Bauxites*, 880 F.2d at 690. Moreover, the court in *United Brass Works* found section 193 to be "largely inapplicable if the risk in question is not the policy's primary insured risk." *United Brass Works, Inc. v. American Guarantee and Liability Ins. Co.*, 819 F.Supp. 465, 469 (W.D.Pa. 1992).

In addition, Continental's reliance on *Jones Truck Lines v. Transport Ins. Co.*, No. 88–5723, 1989 WL 49517 (E.D.Pa. May 10, 1989) is misplaced. First of all, the *Jones Truck Lines* court engaged in a section 193 analysis

only after reciting the contact factors applicable to contract actions generally in section 188(2). *Id.* at *3. Secondly, the court misapplied comment f of section 193, construing it overbroadly to mean that multiple risk policies in general are to be treated as if they involve separate contracts of insurance for each risk. *Id.* Such an interpretation not only misreads comment f, but also eviscerates the relevant portions of comment b cited above.[4]

Continental's argument that the contacts analysis must proceed under section 193 and that Pennsylvania, therefore, has the dominant contact for purposes of this dispute, must be rejected. Rather, the court must look to Restatement section 188, the section applicable to contract actions generally, for guidance as to the relevant contacts with Pennsylvania and New Jersey.[5] *See Compagnie des Bauxites,* 880 F.2d at 690 (citing *Sanderfer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.,* 846 F.2d 319, 324 (5th Cir.1988)).

### 2. Restatement Section 188(2)

Section 188(2) provides that in the absence of an effective choice of law by the parties, as here, the contacts to be considered are: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement § 188(2). Continental is a New Hampshire corporation with its principal place of business in New York. At the time of the negotiation of and entry into the contracts of insurance at issue, Beecham was incorporated in New Jersey and had its principal place of business in New Jersey. Following Beecham's March, 1989 merger with SmithKline Beckman Corporation, SmithKline Beecham Corporation became a Pennsylvania corporation with its principal place of business in Pennsylvania. Pl.App. 1A & 1B. The evidence concerning the place of negotiation of the contracts generally points to New Jersey, although it is acknowledged that occasional meetings pertaining to the renewal of the contracts may have taken place at Continental's New York offices. *See* Wassmer Dep., Def.App. 44 at 54; Coughlin Dep., Def.App. 45 at 27.

The parties offer no clues as to the place of performance of the contracts. "The place of performance of an insurance contract, in the absence of a clause specifically dealing with the issue, is the place where the premiums

---

4. Another case relied on by Continental, *Chesapeake Utilities Corp. v. American Home Assur. Co.,* 704 F.Supp. 551 (D.Del.1989) is similarly unpersuasive. The court in *Chesapeake Utilities* had before it the question of whether a contract of insurance would apply to environmental damage in two states, Maryland and Delaware. The court determined that Maryland law should govern the claims relating to the Maryland site and Delaware should control the claims relating to the Delaware site. *Id.* at 556. In discussing the choice of laws issue under section 193 and quoting at length from comment b, the court inexplicably omitted from its quote that portion of comment b which reads:

> Situations where this [allocation of the insured risk principally to one state] cannot be done, and where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states.

Restatement § 193, comment b.

Likewise, the court's quotation from comment f omitted that portion of the comment which makes specific reference to fire insurance policies and notes that such policies often incorporate special statutory forms from the state in which the insured risk is located. Finally, the court ended the quotation before that portion of comment f which states that a part of a policy which incorporates a special statutory form of a state is to be construed in accordance with that state's laws. *Id.* at 557 n. 13. Having thus drastically altering the meaning of comments b and f, the court found support for its application of two different states' laws to two different insured risks covered by one contract. Surely this anomalous result cannot be reconciled with the clear intent of section 193. To the extent that *Chesapeake Utilities* is cited as authority for the application of Pennsylvania law, this court declines to follow it.

5. Although not raised by either party, the court notes that the same result, i.e. that Restatement section 188 must govern the contacts analysis, would be reached under either of the other two sections which could arguably apply to the contract at issue. Thus, Restatement section 204, pertaining to "Construction of Words in Contract" and Restatement section 205, entitled "Nature and Extent of Contractual Obligation", both point to an analysis under section 188.

**1038**

are paid." *Armotek Indus., Inc. v. Employers Insurance of Wausau,* 952 F.2d 756, 761 (3d Cir.1991).[6] If Beecham paid premiums to Continental's offices in New York, this contact would support New York, a forum whose law neither party champions. In any event, with no evidence in the record as to where premiums were paid, any attempted evaluation of the performance contact would be based on sheer speculation.

The record is similarly unsettled as to the place of contracting. As provided in the Restatement, the place of contracting is the place where the last act necessary to give the contract effect occurred. Restatement § 188, comment c. There is deposition testimony indicating that while some meetings may have taken place in Continental's New York offices, such meetings would have been preliminary in nature and not attended by Robert McEntee or Albert White from Beecham. Coughlin Dep., Def.App. 45 at 27. While this may give rise to an inference that the final signatures were executed in New Jersey, the record remains vague. Continental claims that the policy documents, at least as to one policy, "appear to have been countersigned" in New York. Pl.Reply Br. at 6 n. 2; Def.App. 27 at B08189B–B08214B. If the countersignatures were the last act necessary for the contract to take effect and they occurred in New York, this would support a finding that the law of New York should apply—again, a result which neither party presses.

Despite Continental's denigration of New Jersey's contacts, it asserts only two contacts with Pennsylvania. First, it asserts that SmithKline Beecham, formed as a result of the 1989 merger of Beecham and SmithKline Beckman, is a Pennsylvania corporation with its principal place of business in Pennsylvania. Given that the issue before the court is one of contract interpretation and Beecham

was a New Jersey corporation with its principal place of business in New Jersey throughout the entire time of negotiation and while the contracts were in effect, this contact carries little weight. *See Home For Crippled Children v. Prudential Ins. Co.,* 590 F.Supp. 1490, 1500–01 (W.D.Pa.1984).

Second, Continental asserts that the contaminated property is located in Pennsylvania. To the extent that Continental claims that Pennsylvania is, thus, the place of the insured risk, that argument is undermined by the fact that the insured risk was spread among numerous states. Were Continental's argument accepted by the court, a single contract of insurance could conceivably be subject to fifty different interpretations. *But see Transamerica Ins. Co. v. Thomas Durkin & Sons, Inc.,* No. 90–0968, 1991 WL 246927, *2 (E.D.Pa. November 19, 1991) (finding this assumption "unreasonable")[7]; *Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 250 N.J.Super. 51, 58–59, 593 A.2d 367 (App.Div.1991) (rejecting this argument under New Jersey choice of law analysis). To the extent that Continental presses the relevance of this contact because it is the subject matter of this suit, this argument, too, must be rejected. This action is a contract dispute; the relevance of contacts must be viewed with reference to the contract. Pennsylvania courts have routinely rejected the situs of the occurrence of a tort as a contact relevant to a dispute over an insurance contract. *McCabe v. Prudential Property and Casualty Ins. Co.,* 356 Pa.Super. 223, 232, 514 A.2d 582 (1986); *Nationwide Mutual Ins. Co. v. Walter,* 290 Pa.Super. 129, 138, 434 A.2d 164 (1981).

### B. Interest Analysis

Proceeding to the second arm of the *Griffith* framework, the court must "evaluat[e] qualitatively the policies underlying the sig-

---

**6.** Although *Armotek* involved New Jersey choice of law principles, the court can find no Pennsylvania decision stating a different rule.

**7.** This court does not necessarily share the *Durkin* court's apprehension as to an insurance company requiring its policies to be construed under the law of the state which is most restrictive in interpreting coverage issues. It is not the case that the parties' right to choose which state's law

will govern a contract is unfettered. *See* Restatement § 187, comments f and g (requiring that there be a "reasonable basis" for choosing a particular state's law and noting that parties' choice of law will be ineffective where the chosen law would be contrary to a fundamental policy of the state whose law would otherwise have governed).

nificant relationships to the controversy." *Griffith*, 416 Pa. at 22, 203 A.2d 796. This interest analysis, which tempers the Restatement's contacts analysis, is intended to ensure that the law of the state "having the most interest in the problem and which is most intimately concerned with the outcome" will govern. *Spratley v. Aetna Casualty & Surety Co.*, 704 F.Supp. 595, 597 (E.D.Pa. 1989) (quoting *Breskman v. B.C.B. Inc.*, 708 F.Supp. 655, 656 (E.D.Pa.1988)). Stated somewhat differently, the court must determine "the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *McSwain v. McSwain*, 420 Pa. 86, 94, 215 A.2d 677 (1966).

The primary dispute between the parties is the interpretation of the pollution exclusion clause included in the CGL policies issued to Beecham by Continental. The court must examine the laws of New Jersey and Pennsylvania to determine if they differ, discern the policies of each state underlying its law, and decide, based on these policies, which state has a priority interest in having its law applied to this dispute. A review of this nature yields the conclusion that New Jersey has a greater interest in having its law apply.

In order for there to be coverage under the policies at issue, there must be an "occurrence," defined as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured." The pollution exclusion clause, however, provides that injury and property damage arising from pollution is generally not covered by the policy unless the "discharge, dispersal, release or escape is sudden and accidental". The relevant distinctions between Pennsylvania and New Jersey law relate to how the pollution exclusion clause is to be read in relation to the definition of "occurrence".

Pennsylvania law is clear that the pollution exclusion clause is unambiguous and that the limitation rendering that clause inapplicable to discharges that are "sudden and accidental" is not merely a restatement of the "nei-

ther expected nor intended" language of the occurrence definition. Thus, under Pennsylvania law the "sudden and accidental" language has been interpreted to mean that the pollution exclusion clause will apply except where discharges "are abrupt and last a short time." *Northern Ins. Co. v. Aardvark Assoc., Inc.*, 942 F.2d 189, 193 (3d Cir.1991); *see also Lower Paxon Township v. United States Fidelity & Guaranty Co.*, 383 Pa.Super. 558, 577, 557 A.2d 393 (1989); *Techalloy Co. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 13, 487 A.2d 820 (1984); *Nationwide Mutual Ins. Co. v. R.P. Hoffman Mobil, Inc.*, No. 90–1187, slip op. at 7–8 (E.D.Pa. September 17, 1992).

Until recently, it was somewhat unclear as to how the pollution exclusion clause was to be interpreted under New Jersey law. The Supreme Court of New Jersey, however, addressed the issue head-on in *Morton Int'l, Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993). After an extensive analysis, the court concluded that although the literal language of the pollution exclusion clause would ordinarily support a reading that "sudden" has a temporal component, the representations of the insurance industry in the course of obtaining regulatory approval for the language of the standard pollution exclusion, and specifically the representation that it was merely to "clarify" the definition of "occurrence" to exclude intentional polluters, mandate that the clause be given a different meaning. The court held:

> Accordingly, we hold that notwithstanding the literal terms of the standard pollution exclusion clause, that clause will be construed to provide coverage identical with that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected.

*Id.* at 66, 629 A.2d 831. Thus, under New Jersey law the pollution exclusion clause is read more narrowly than it is under Pennsylvania law.

As previously noted, Pennsylvania's only meaningful connection to this action is that

the contaminated site is located within the state. To be sure, Pennsylvania has an interest in the proper treatment and remediation of environmentally contaminated sites within its borders. At issue, however, is the interpretation of a contract. Pennsylvania's interest in interpreting the pollution exclusion clause to encompass a temporal element over and above the "sudden and accidental" requirement inherent in the occurrence definition, and avoid what its courts have held to be a "blatantly unreasonable" interpretation which would "rewrite the policy by excluding one important pollution coverage requirement," is undoubtedly a legitimate one. *Lower Paxon Township,* 383 Pa.Super. at 577, 557 A.2d 393. Interpreting insurance contracts to mean what they say furthers the goal of meeting the reasonable expectations of the parties.

This policy of Pennsylvania, however, simply lacks the requisite nexus to this action to speak forcefully for the application of Pennsylvania law. The contracts between Continental and Beecham were not negotiated, entered into, or performed in Pennsylvania. At the time the contracts were entered into, neither party was a Pennsylvania corporation or had its principal place of business in the state. While one insured risk was in Pennsylvania, there were numerous other risks in other states, minimizing the importance of that factor.[8]

New Jersey, on the other hand, has repeatedly demonstrated a strong policy of protecting the insured in its interpretation of insurance contracts. The Supreme Court of New Jersey has opined on numerous occasions that insurance contracts are subject to principles of adhesion contract analysis such that where there is an ambiguity in the contract that will reasonably support two meanings, the ambiguity must be resolved in favor of coverage. *Voorhees v. Preferred Mutual Ins. Co.,* 128 N.J. 165, 175, 607 A.2d 1255 (1992); *Meier v. New Jersey Life Ins. Co.,* 101 N.J. 597, 612–613, 503 A.2d 862 (1986); *Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 335, 495 A.2d 406 (1985); *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 305, 208 A.2d 638 (1965); *Mazzilli v. Acci. & Casualty Ins. Co.,* 35 N.J. 1, 7, 170 A.2d 800 (1961). It has held as well that "courts are bound to protect the insured to the full extent that any fair interpretation will allow." *Mazzilli,* 35 N.J. at 7, 170 A.2d 800.

Viewed in this light, it becomes apparent that Pennsylvania has no true interest in having its law applied here. The state's interpretation of the pollution exclusion clause presumably adheres to its policy of interpreting contracts made by its residents or within its borders in such a way that all the terms incorporated by the parties will be given effect. Yet Pennsylvania's lone contact, the location of the contaminated site in the state, bears no relation to this policy. Moreover, the application of Pennsylvania law would tend to limit coverage in environmental contamination cases. In other words, interpreting the contract according to Pennsylvania law would undermine the state's interest in this dispute—optimizing environmental cleanup.

While, of course, whether a site is cleaned up is distinct from who pays for the cleanup, to conclude that the source of payment for environmental cleanup is irrelevant to its efficacy would be to ignore reality. *See Johnson Matthey,* 250 N.J.Super. at 57, 593 A.2d 367. In any event, whether Pennsylvania's interpretation of the pollution exclusion clause would be *contrary* to Pennsylvania's interest is of no moment. What is important, and what identifies this case as a "false conflict," is that this dispute does not affect the reasons which led Pennsylvania to interpret the pollution exclusion clause as it does. Kramer, *supra,* at 297.

---

8. A powerful argument can be made, in fact, that this is what Professor Currie and subsequent interest analysis scholars have termed a "false conflict." *See* Brainerd Currie, *Notes on the Methods and Objectives in the Conflict of Laws, in Selected Essays on the Conflict of Laws* 177 (1963). According to this school of thought, the first step in determining which state's law to apply is to determine if there is a true, as opposed to false, conflict. *Id.* at 183–84. A false conflict arises when, although the parties assert that two different state's laws are applicable, only one state has an interest in having its law apply. *Id.*

While this is easily said, it begs the question as to how to determine whether a state has the requisite interest. The interest of a state, this view holds, depends upon the purpose of the law in question:

> The point is elegantly simple: if—in the interests of comity and mutual accommodation—we presume that a state's law is intended to apply only in cases that are connected to the state in some important way, the significant contacts ought to be those that implicate the reasons the law was enacted for wholly domestic cases.

Larry Kramer, *Rethinking Choice of Law,* 90 Colum.L.Rev. 277, 296 (1990).

The strength of this policy in New Jersey is nowhere more evident than in the Supreme Court's *Morton* opinion. The court chastised the insurance industry for representations that it characterized as "not only astonishing but also inaccurate and misleading as well," *Morton, supra,* at 38, 629 A.2d 831, and staunchly defended the insurance consumers who were victimized by the incomplete disclosures of the insurance industry in the process of obtaining regulatory approval for the pollution exclusion clause:

> This court is now asked to construe CGL policies containing the pollution exclusion clause in a manner consistent with the clause's literal language, ignoring the industry's misleading presentation to state regulators over twenty years ago, and overlooking the apparent unfairness that such an interpretation would impose on policyholders who were charged rates that did not reflect the radical diminution in coverage contemplated by the insurance industry. So to construe the pollution exclusion would, in this Court's view, violate this State's strong public policy requiring regulation of the insurance business in the public interest, and would reward the industry for its misrepresentation and non-disclosure to state regulatory authorities.

*Id.* at 73, 629 A.2d 831.

In order to protect the insured and fairly interpret the boundaries of insurance coverage, New Jersey courts give effect to the reasonable expectations of the insured. *Meier,* 101 N.J. at 612, 503 A.2d 862 (citing *Di Orio v. New Jersey Mfrs. Ins. Co.,* 79 N.J. 257, 269–70, 398 A.2d 1274 (1979). In this connection, the *Morton* court imputed the reasonable expectations of the New Jersey insurance regulatory authorities, as informed by the representations of industry groups, to those insured's with CGL policies containing the pollution exclusion clause. *Morton, supra,* at 74, 629 A.2d 831.

The vitality and consistency of New Jersey's policy of resolving ambiguities in insurance contracts in favor of insureds and, more importantly, the intimate connection of this policy to New Jersey's contacts to this action—that Beecham was a New Jersey corporation doing business in New Jersey and

that some, if not all, of the negotiation of the contracts took place in New Jersey—lead inexorably to the conclusion that New Jersey has a priority interest in having its law applied in this action. The heart of this dispute is the insurance contracts, which have the most significant contacts with New Jersey. In turn, New Jersey has a strong policy of protecting its insured citizens in insurance contract interpretation. Where the contacts and interests of one state so starkly rise above all other contacts and interests, the choice of law is evident: New Jersey law must be applied.

## IV. Coverage Issues

■ As a federal court sitting in diversity, this court must predict how the highest court of the state whose law is being applied would rule. *Adams v. Madison Realty & Dev., Inc.,* 853 F.2d 163, 168 (3d Cir.1988); *Blum v. Witco Chemical Corp.,* 829 F.2d 367, 376 (3d Cir.1987). As previously mentioned, during the pendency of these motions, the law of New Jersey with respect to the pollution exclusion clause was clarified by the Supreme Court's decision in *Morton.* At least with respect to the definition of "occurrence" and the pollution exclusion clause appearing in the CGL policies, that decision will inform and guide this court's decision.

### A. Burden of Proof

■ The parties' competing assertions as to the burdens of proof are easily resolved. The Third Circuit has held that the burden of proof is a matter of substantive rather than procedural law and that, therefore, the principles of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), require a federal court to allocate the burdens in accordance with state law. *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1174 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). New Jersey law is clear that when an insurer seeks a declaration of noncoverage by way of a declaratory action, the insurer, as plaintiff, bears the burden of proving the facts alleged in the complaint. *Summit Assoc. v. Liberty Mutual Fire Ins. Co.,* 229 N.J.Super. 56, 62–63, 550 A.2d 1235 (App. Div.1988); *Concord Ins. Co. v. Miles,* 118

N.J.Super. 551, 555, 289 A.2d 267 (App.Div. 1972); *Hanover Ins. Group v. Cameron,* 122 N.J.Super. 51, 56, 298 A.2d 715 (Ch.Div. 1973). Here, Continental has alleged that there was no "occurrence" giving rise to coverage under the CGL policies. Therefore, Continental will bear the burden of proving that the ultimate damage was expected or intended by Beecham. *Morton, supra,* 134 N.J. at 17, 629 A.2d 831; *New Castle County v. Hartford Accident and Indemnity Co.,* 933 F.2d 1162, 1197 (3d Cir.1991) (cited in *Morton* ).

■ Moreover, New Jersey law is equally clear that the insurer must bear the burden of demonstrating that a policy exclusion would bar coverage. The New Jersey cases to this effect are legion. *See, e.g., Transamerica Ins. Co. v. National Roofing, Inc.,* 108 N.J. 59, 65, 527 A.2d 864 (1987); *United Rental Equipment Co. v. Aetna Life and Casualty Ins. Co.,* 74 N.J. 92, 99, 376 A.2d 1183 (1977); *Burd v. Sussex Mutual Ins. Co.,* 56 N.J. 383, 399, 267 A.2d 7 (1970); *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.,* 258 N.J.Super. 167, 216, 609 A.2d 440 (1992); *Aetna Ins. Co. v. Weiss,* 174 N.J.Super. 292, 296, 416 A.2d 426 (App.Div.), *certif. denied,* 85 N.J. 127, 425 A.2d 284 (1980); *Reliance Ins. Co. v. Armstrong World Industries, Inc.,* 259 N.J.Super. 538, 559, 614 A.2d 642 (Law Div.1992). This burden requires not only that the insurer demonstrate that the exclusion applies, but also that the "sudden and accidental" exception to the exclusion does not apply. *See New Castle County,* 933 F.2d at 1182 (predicting that the Delaware Supreme Court would allocate not only the burden of proving that the pollution exclusion is applicable but also the burden of proving that the "sudden and accidental" exception to the exclusion is not applicable in line with the traditional distinction between coverage clauses and exclusionary clauses).

Of course, the insured must carry the burden with respect to any affirmative defenses asserted by it. *Hanover Ins. Group,* 122 N.J.Super. at 56, 298 A.2d 715.

### B. Occurrence and Pollution Exclusion

Prior to the Supreme Court's ruling in *Morton* with reference to the interpretation of the pollution exclusion clause under New Jersey law, the weight of New Jersey case law was in accord with the Appellate Division's holding in *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987), i.e. that the "sudden and accidental" language of the pollution exclusion clause is simply a restatement of the "neither expected nor intended from the standpoint of the insured" language of the occurrence definition. *See CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.,* 962 F.2d 77 (1st Cir.1992); *National Starch and Chemical Corp. v. Great American Ins. Cos.,* 743 F.Supp. 318 (D.N.J.1990); *Marotta v. RLI Ins. Co.,* No. 87–4430, 1990 WL 359763 (D.N.J. June 5, 1990); *Summit,* 229 N.J.Super. at 63, 550 A.2d 1235; *CPS Chemical Co. v. Continental Ins. Co.,* 199 N.J.Super. 558, 489 A.2d 1265 (Law Div. 1984), *rev'd on other grounds,* 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985); *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.,* 186 N.J.Super. 156, 451 A.2d 990 (Law Div.1982); *Lansco, Inc. v. Dept. of Environmental Protection,* 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1975), *aff'd,* 145 N.J.Super. 433, 368 A.2d 363 (1976), *certif. denied,* 73 N.J. 57, 372 A.2d 322 (1977). In *Morton,* however, the Supreme Court expressly overruled *Broadwell Realty* to the extent that *Broadwell Realty* held that the standard pollution exclusion clause is merely a restatement of the unexpected and unintended requirement of "occurrence". *Morton, supra,* at 29, 629 A.2d 831.

The *Morton* court recognized that the word "sudden" generally has a temporal element and that "sudden and accidental" as used in the pollution exclusion clause referred to "those discharges, dispersals, releases, and escapes of pollutants that occur abruptly or unexpectedly and are unintended." *Id.* Nevertheless, the court declined to enforce the clause as written, finding, as noted earlier, that the insurance industry had substantially misled regulators in the course of gaining approval for the use of the pollu-

tion exclusion clause in standard CGL policies. In particular, the court found that the industry's description of the pollution exclusion clause as a "clarification ... to avoid any question of intent," i.e., to preclude insurance coverage for intentional polluters, disingenuous in light of the industry's general position today that the exclusion precludes coverage for all pollution unless the discharge of the pollutants was abrupt or from a "boom" event. *Id.* at 37, 629 A.2d 831.

█ After engaging in what can only be called a monumental survey of judicial treatment of the pollution exclusion clause in state and federal courts, the court concluded that irrespective of whether the pollution exclusion clause is interpreted to mean "abrupt" or "unexpected", the effect of the clause on coverage for damage caused by pollution would not be the same as in a strictly occurrence-based policy. The real issue before it, opined the court, was whether the pollution exclusion clause should be applied in accordance with its literal meaning when that would result in a drastic—and, from the standpoint of regulators, unforeseen—reduction in coverage for pollution-caused damages. *Id.* at 69, 629 A.2d 831. Based on the representations—or misrepresentations—of the insurance industry, the court held that the pollution exclusion clause

> will be construed to provide coverage identical with that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected.

*Id.* at 77, 629 A.2d 831. Thus, in order to prevail on its motion for summary judgment regarding the pollution exclusion clause, Continental must show as a matter of law that Beecham intentionally discharged pollutants. On the other hand, in order to prevail on its motion insofar as it concerns the pollution exclusion clause, Beecham must demonstrate that there is an issue of material fact as to whether it intentionally discharged pollutants.

*Morton* also addressed the definition of "occurrence", i.e. "an accident, including con-

tinuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." The occurrence requirement will be satisfied where the injury, here environmental contamination, was unexpected and unintended. It is the intent or expectation of causing the injury, rather than the intent to do the act which precipitates the injury, which controls. *See Morton, supra,* at 80, 629 A.2d 831; *SL Indus., Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 207–08, 607 A.2d 1266 (1992) (in the context of defining an occurrence, the relevant inquiry is into the insured's intent to cause the injury rather than the act that resulted in the injury); *Lyons v. Hartford Ins. Group,* 125 N.J.Super. 239, 245, 310 A.2d 485 (App.Div.1973), *certif. denied,* 64 N.J. 322, 315 A.2d 411 (1974) (coverage exists for unintended results of intentional acts). Moreover, in determining whether there was an intent to cause an injury, it is the subjective intent of the alleged wrongdoer which is relevant. *Morton, supra,* at 80, 629 A.2d 831; *Voorhees v. Preferred Mutual Ins. Co.,* 128 N.J. 165, 185, 607 A.2d 1255 (1992); *see also J.T. Baker, Inc. v. Aetna Casualty and Surety Co.,* 135 F.R.D. 86, 90 (D.N.J.1989). The *Morton* court noted that the insured's intent to injure could be objectively established in some instances where "exceptional circumstances" demonstrate such intent. *Morton, supra,* at 83, 629 A.2d 831.

█ Thus, in order to prevail on a motion for summary judgment with reference to whether there was an "occurrence", Continental must demonstrate that Beecham either expected or intended the contamination at the Myerstown plant. Beecham can defeat this aspect of Continental's motion by raising a genuine issue of material fact as to whether it expected or intended the contamination. On the other hand, Beecham may prevail on its motion for summary judgment insofar as it seeks to strike the counts of Continental's declaratory judgment complaint related to the occurrence requirement only if it is able to show that Continental cannot raise any factual issue as to at least one element for which Continental will bear

the burden of proof at trial, i.e. that Beecham expected or intended the contamination.

■ Continental contends that throughout its ownership of Whitmoyer—and before—Beecham was aware that the plant's operations were adding to the air, land, and groundwater contamination and, thus, that it expected or intended that contamination. Continental also raises subsidiary arguments, one of which is that coverage is barred by the "loss in progress" doctrine. Beecham counters that there is no evidence that it expected or intended the contamination, a position, it claims, which is bolstered by the fact that Continental's own technical personnel who inspected the site did not uncover the contamination. In addition, Beecham points out that the policies contained an endorsement providing that coverage can be denied for nondisclosure of hazards only if such nondisclosure was intentional.[9] Finally, Beecham argues that Continental should be estopped from denying coverage based on a loss in progress because it initially failed to assert this ground.

Reviewing the facts of record, it is apparent that Beecham cannot prevail on its motion for summary judgment as to the pollution exclusion clause or the occurrence requirement. There is at the very least an issue of fact as to whether Beecham intentionally dispersed or discharged pollutants. Moreover, although it is a closer call, the evidence points to a factual issue as to whether the environmental damage resulting was expected or intended such that there was or was not an occurrence, i.e. whether Beecham intended to cause the damage. The deposition testimony of Lloyd Croesus, Whitmoyer's Safety and Environmental Manager, indicates that he informed Beecham personnel that there had been contamination prior to Rohm & Haas' purchase of Whitmoyer and that there was still some groundwater and soil arsenic contamination. Croesus Dep., Pl.App. 8 at 118–119. Croesus also testified that in 1979 he noticed cracks in the arsenic waste vault. Croesus Dep., Pl.App. 8

at 330. He stated, as well, that, as a memorandum he wrote at that time indicated, Beecham had expressed concerns about leaking or leaching from the concrete vault containing arsenic waste. *Id.* at 330–32. Continental also points to that portion of the Purchase Agreement between Beecham and Rohm & Haas disclosing the bottled water agreements between Whitmoyer and local residents. Although, as noted earlier, Beecham attacks Croesus' credibility and the Beecham employees involved deny that they were informed of the arsenic contamination or the remediation efforts by Rohm & Haas, and although Beecham's General Counsel Albert White denies having seen that portion of the Purchase Agreement pertaining to the bottled water, the court cannot disregard the Croesus testimony and other disputed evidence. Who and what is to be believed is for trial.

In reviewing the record with an eye toward Continental's motion, it is similarly apparent that factual disputes preclude summary judgment. Aside from the fact that the Beecham personnel involved in the acquisition of Whitmoyer have denied that they were told about the arsenic contamination at the site or about Rohm & Haas' remediation efforts prior to 1978, Beecham has evinced at least some dispute of fact relating to each of Continental's asserted grounds for summary judgment. For instance, Whitmoyer Operations Committee members Anthony Bott and Leroy Kauffman indicated that the committee believed that the concrete vault at the site was adequately sealed. Bott Dep., Def. App. 39 at 38; Kauffman Dep., Def.App. 40 at 62. In short, factual disputes, both concrete and inferential, mandate the conclusion that Continental cannot meet its burden with respect to whether there was an "occurrence" or its burden with respect to the pollution exclusion clause.

## C. Waiver/Estoppel of Coverage

Beecham contends that Continental should be estopped from litigating three additional

9. This endorsement provides:
It is agreed that failure of the named insured to disclose all hazards existing at the effective date of the policy shall not prejudice the insured with respect to the insurance afforded by this policy if such failure is not intentional. Def.App. 27, Endorsement 3.

defenses to coverage. Beecham claims that Continental raised these coverage defenses, i.e. the "known loss" or "loss in progress" doctrine, the named insured endorsement, and the alienated premises exclusion, for the first time in its motion for summary judgment and that, because Continental had previously disclaimed coverage on other specified grounds but not these, it has waived or is estopped from arguing these "new" defenses. Continental's rejoinder is that the loss in progress doctrine is subsumed within the occurrence issue, which was one of its original bases for disclaiming coverage, and that, in any event, coverage cannot be expanded by the invocation of waiver or estoppel.

■ Beecham's argument that Continental has waived the defenses based on the named insured endorsement and the alienated premises exclusion is persuasive. In a July 23, 1987 letter to Beecham, Continental set out its "preliminary" position on the issue of coverage and stated that coverage might be denied for several reasons: because there was no "occurrence", there was no property damage as defined by the policies during the policy period, the pollution exclusion clause barred coverage, the owned property exclusion barred coverage, and Beecham did not timely notify Continental. Def.App. 48. On September 14, 1987, Continental formally denied coverage, noting that "[t]his position is based primarily upon the reasons set forth in [the] letter to you dated July 23, 1987." Def. App. 49. The September 14th letter, which noted that Continental found it necessary to institute a declaratory judgment action, did not set forth any additional grounds for its denial of coverage. *Id.* Moreover, as detailed in the amended complaint, Continental asserts only the following grounds in this action: no occurrence (Count I), the pollution exclusion clause (Count II), no timely notice (Count III), the owned property exclusion (Count IV), and CERCLA relief does not constitute legal damages (Count V).

■ It is evident that at no point prior to its summary judgment motion did Continental deny coverage on the basis of the named insured endorsement or the alienated premises exclusion.[10] Because Continental never alerted Beecham that it would seek to deny coverage on these grounds, it cannot, after the close of discovery and prior to trial, invoke them now. An insurer that does not disclaim on a certain ground has no right to raise that ground in a declaratory action initiated to determine if there is coverage. *Mariani v. Bender*, 85 N.J.Super. 490, 499, 205 A.2d 323 (App.Div.1964). Moreover, Continental's citation to case law outside of New Jersey for the proposition that the terms and coverage of a policy cannot be expanded by waiver or estoppel does not find support within New Jersey. While it is true that a majority of courts accept that proposition, New Jersey has explicitly considered and rejected it. *Harr v. Allstate Ins. Co.*, 54 N.J. 287, 307, 255 A.2d 208 (1969) ("We agree with the Appellate Division that New Jersey should adopt the view that equitable estoppel is available, under appropriate circumstances, to bring within insurance coverage risks or perils which are not provided for in the policy or which are expressly excluded.").

■ With respect to the denial of coverage on the basis of the known loss or loss in progress defense, however, this court concurs with Continental's characterization of this issue as subsumed within the issue of whether there was an "occurrence". Because Beecham had ample notice that Continental was asserting that there was no occurrence, Continental will not be deemed to have waived or be estopped from raising this claim. Nonetheless, as the foregoing discussion of whether there was the requisite occurrence in this case makes plain, Continental cannot establish as a matter of law that the contamination at the Myerstown facility was in progress such that coverage, at least at this juncture, should be denied.

10. That Continental indicated in the Final Pretrial Order that it intended to move for summary judgment on the named insured endorsement is of no moment. Final Pretrial Order at 2–3. Conspicuously, with the exception of the named insured endorsement defense, each of Continental's other stated grounds for summary judgment pertains to a count of the amended complaint. *Id.* Its mention of this defense in the Final Pretrial Order does not vitiate the prejudice which would inure to Beecham's detriment if this defense were permitted given that the notice given in the Final Pretrial Order came only after the close of discovery.

The known loss doctrine is based on·the fundamental principle that insurance is intended to cover risks which are not definitely known to the insured. The loss in progress doctrine, as differentiated from the known loss doctrine, provides that one cannot insure a loss that is already in progress. *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982); *Center Realty v. Petroleum and Chemical Technology, Inc.*, No. W–011751–89, transcript at 48 (Superior Court of New Jersey, Law Div., April 8, 1991) (transcript of opinion delivered from the bench) ("one cannot obtain insurance for a risk that the insured knows has already transpired."). Factual disputes as to whether Beecham knew of any "loss" and as to whether any loss was in progress before the effective date of any of the policies at issue dictate that Continental must present its argument to the factfinder.[11]

### D. Equitable Estoppel Applied to Continental

Beginning with the 1977–78 policy, Beecham's CGL policies with Continental were governed by a retrospective rating plan under which premiums were paid retrospectively based on a formula using the losses sustained in that year. DiGuilio Cert., Def. App. 24 ¶ 2, 6. Beecham argues that because Marsh & McLennan, the insurance broker handling the Continental policies sold to Beecham, issued an invoice for a $282,224 retrospective premium on October 2, 1989, *see* DiGuilio Cert. ¶ 8, Continental should be estopped from denying that it must defend and indemnify Beecham under the 1977–78 policy. Continental asserts that estoppel is not warranted because Beecham suffered no prejudice.

New Jersey courts have noted in the insurance context that "undoubtedly prejudice is an essential ingredient" of estoppel. *Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 129, 179 A.2d 505 (1962). In some instances, however, as in a case in which an insurance company exercises control of a claim or assumes an insured's defense and later seeks to deny coverage, a presumption of prejudice will operate and the insurer will be estopped from denying coverage. *Sneed v. Concord Ins. Co.*, 98 N.J.Super. 306, 320, 237 A.2d 289 (App.Div.1967) (construing *Eggleston* ). The court in *Sneed* held that

without an effective nonwaiver agreement an insurer who exercises its policy right exclusively to control the handling of a claim against its insured for a substantial period after it knows it has a basis for denial of coverage will be estopped thereafter to disclaim liability on the policy. Prejudice to the insured will be assumed because the "course cannot be rerun" so as to determine whether the insured would in fact have fared better on his own if the insurer had disclaimed promptly.

*Id.*

Unable to claim that Continental took control of its claim or defense as in *Sneed,* Beecham turns instead to *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163 (1982). In *Griggs,* the Supreme Court of New Jersey extended the principles espoused in *Eggleston* and *Sneed* to a situation in which an insurer did not assume control of the case but, rather, did nothing for approximately eighteen months after receiving notice of the claim.

---

**11.** The parties also dispute the force and effect of the inspections performed by Continental's technical personnel. While Beecham's insurance manager, Paul Pfeffer, asserts that he relied on Continental's technical personnel to inform him of potential risks at the Myerstown facility, *see* Certification of Paul Pfeffer, dated March 31, 1992, ¶ 5, Continental maintains that the primary purpose behind sending its technical personnel to the plants was to inspect working conditions with regard to worker's compensation matters. *See* Pfeffer Dep., Pl.Reply App. 4 at 90. Clearly, endorsement three of the policies provides that coverage will not be denied for failure of the insured to disclose all existing hazards unless such nondisclosure was intentional. Def.App. 27

at B08161B. This provision does not, nor does either party seriously suggest that it should, absolve Beecham of all responsibility to disclose hazards; indeed, Beecham must disclose all hazards known to it. The report of James A. Robinson, on which Beecham relies, opines that this endorsement places the responsibility of performing inspections to uncover hazards on the insurer rather than the insured. Robertson Report, Def.App. 46 at 4. Whether this is so, whether Continental inspected for and should have known of contamination, and whether Beecham had knowledge of arsenic contamination at the Myerstown plant are all subject to factual disputes which cannot be resolved on motions for summary judgment.

*Griggs*, 88 N.J. at 361–62, 443 A.2d 163. The court relied upon the insured's reasonable expectation, created by the fiduciary duty of fairness and good faith owed by the insurer to the insured, that, in the absence of some repudiation or other action by the insurer inconsistent with its right to control the claim, the insurer is vigorously exercising its contractual right to control the defense in such a manner as to protect the insured. *Id.* at 362, 443 A.2d 163. The court noted, however, that this reasonable expectation can be dispelled by a contrary action, such as notice of a possible disclaimer of coverage. *Id.*

 The circumstances under which the retrospective premium was billed to Beecham demonstrate that it would be inappropriate to estop Continental from denying that it must defend and indemnify under the 1977–78 policy. Beecham has not claimed that Continental assumed control of the claim, as in *Eggleston*, or prejudiced it by failing to take any measures for a substantial period of time, as in *Griggs*. Rather, it claims prejudice because it is "entitled to proper claims handling." Def.Reply Br. at 11. Beecham's claim of prejudice cannot withstand scrutiny. The invoice was sent out by Marsh & McLennan in October, 1989, more than two years after the present coverage litigation had begun and while discovery was ongoing. The invoice apparently was withdrawn when Continental management realized that it had been issued, and Beecham never paid the amount billed. Under these circumstances, Beecham's attempt to gain a tactical advantage from an action on the part of Continental from which it suffered no real prejudice must be rejected. *See Liberty Mutual Ins. Co. v. Triangle Industries, Inc.*, 957 F.2d 1153, 1160 (4th Cir. 1992) (finding no estoppel where no prejudice); *Reliance v. Armstrong World Indus., Inc.*, 265 N.J.Super. 148, 157, 625 A.2d 601 (Law Div.1993) (estoppel of an insurance company from denying coverage "can only result when there is a demonstrative prejudice to the insured").[12]

**E. Timeliness of Beecham's Notification**

 Count III of Continental's amended complaint alleges that Beecham did not notify Continental of an "occurrence" in a timely fashion as required by the policies. Beecham seeks summary judgment on Count III of the amended complaint, contending that its notification was timely and that, even were it not deemed timely, Continental is unable to demonstrate the prejudice required to disclaim coverage on this basis under New Jersey law.

Beecham first received notice from the PADER that it was a potentially responsible party ("PRP") on April 30, 1986. Def.App. 20. On May 8, 1986, Beecham sent a letter informing insurance broker Davis, Dorland & Co. of the notice received from the PADER and requesting that it advise all Beecham insurance carriers. Def.App. 35. Davis, Dorland notified Continental in a letter dated May 12, 1986. Def.App. 36. The speed with which Beecham notified Continental relative to the PRP notification on April 30, 1986 is not questioned. Instead, Continental bases its untimely notification argument on the premise that Beecham had knowledge of an occurrence prior to 1978. As should now be clear, this contention is the subject of vigorous dispute between the parties and cannot be resolved on these motions for summary judgment. Nevertheless, Beecham asserts that summary judgment is appropriate as to this issue because Continental cannot raise a genuine issue of material fact as to the requisite showing of prejudice.

 Under New Jersey law, an insurer cannot succeed on a late notice defense unless it can show that it has suffered appreciable prejudice by reason of the late notice. *Cooper v. Government Employees Ins. Co.*, 51 N.J. 86, 94, 237 A.2d 870 (1968); *Solvents Recovery Service v. Midland Ins. Co.*, 218 N.J.Super. 49, 54, 526 A.2d 1112 (App.Div. 1987); *Costagliola v. Lawyers Title Ins. Corp.*, 234 N.J.Super. 400, 406, 560 A.2d 1285

---

12. This court similarly rejects Beecham's argument that Continental waived its right to deny coverage by setting a reserve for Beecham's claim. The mere setting of a reserve by an insurer does not have the probative force of an admission. *See Boeing Co. v. Aetna Casualty & Surety Co.*, No. C86–352WD, slip op. at 7 (W.D.Wash., May 11, 1989); *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 117 F.R.D. 283, 288 (D.D.C.1986).

(Ch.Div.1988); *Morales v. National Grange Mutual Ins. Co.*, 176 N.J.Super. 347, 351, 423 A.2d 325 (Law Div.1980). The burden of showing prejudice rests with the insurer. *Cooper*, 51 N.J. at 94, 237 A.2d 870; *Solvents Recovery Service*, 218 N.J.Super. at 54, 526 A.2d 1112. The question of whether appreciable prejudice exists is a factual question unique to each case. *Allstate Ins. Co. v. Grillon*, 105 N.J.Super. 254, 260, 251 A.2d 777 (App.Div.1969); *Morales*, 176 N.J.Super. at 351, 423 A.2d 325. The court in *Morales* examined precedent in New Jersey as well as in other states and distilled two variables relevant to the determination of whether there has been appreciable prejudice: (1) whether substantial rights have been "irretrievably lost" by the late notice and (2) whether the insurer can demonstrate that it would have had a meritorious defense had there been timely notification. *Morales*, 176 N.J.Super. at 355–56, 423 A.2d 325.

Beecham asserts that Continental has failed to demonstrate any prejudice resulting from the timing of Beecham's notification. The only claim of prejudice that Continental makes is the claim that its investigation has been hampered due to "the apparent loss of Whitmoyer's files" since 1978, citing the deposition testimony of Thomas Fitzgerald. What the cited testimony reveals, however, is that Fitzgerald went to the PADER to review documents in the possession of the PADER and that certain of those documents were later photocopied by agents for Beecham. Fitzgerald Dep., Pl.Opp.App. 7 at 120. As Beecham points out, it appears that the files in question were or are in the possession of the PADER and that, therefore, Continental had access to them even if Beecham later lost its copies—a point which is not at all clear from the excerpt of the deposition provided to the court. In any event, this one allegation of prejudice with scant support in the record is far from sufficient to support a denial of coverage based on late notice. Because Continental would bear the burden of showing prejudice at trial, and because it has been unable to raise a genuine issue of material fact as to that element in response to Beecham's motion for summary judgment on Count III of the amended complaint, summary judgment will be granted as to Count

III. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### F. The Owned Property Exclusion

■ Beecham has also moved for summary judgment on Count IV of Continental's amended complaint, arguing that the owned property exclusion does not prohibit coverage in this case. The owned property exclusion in the CGL policies provides:

This insurance does not apply:

(k) to property damage to·

(1) property owned or occupied by or rented to the insured

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is

for any purpose exercising physical control Def.App. 27 at B08071B. The general purpose of this provision is to exclude from coverage those costs associated with cleaning up an insured's own property. *Broadwell Realty*, 218 N.J.Super. at 528, 528 A.2d 76; *McNeilab, Inc. v. North River Ins. Co.*, 645 F.Supp. 525, 537–39 (D.N.J.1986), *aff'd mem.*, 831 F.2d 287 (3d Cir.1987). New Jersey recognizes, however, that on-site remediation costs incurred to prevent contamination of property owned by third parties are not excluded by the owned property exclusion. *Broadwell Realty*, 218 N.J.Super. at 528, 528 A.2d 76; *Marrota Scientific Controls, Inc. v. RLI Ins. Co.*, No. 87–4438, slip op. at 30, 1990 WL 359763 (D.N.J. June 4, 1990). Beecham notes that damage to groundwater is similarly not excluded from coverage under the owned property exclusion. *See Ray Petroleum Co. v. Insurance Co. of North America*, No. A–1315–85T1 (N.J.Sup.Ct., App.Div., November 26, 1986); *Reliance*, 265 N.J.Super. at 162, 625 A.2d 601.

The parties do not dispute this statement of New Jersey law. Beecham argues that it is entitled to judgment on Count IV as a matter of law because it never owned the Myerstown site but, rather, only owned 100% of the stock of Whitmoyer, which owned the site. Def.Br. at 31–32. Beecham cites no case law in support of this apparently novel theory, and this court rejects it out of hand as exalting form over substance. Beecham's argument having been rejected, the court

must deny Beecham's motion for summary judgment as to the owned property exclusion. Whether the contamination at issue is covered at all is in dispute, and the nature and extent of the remediation costs associated with damage to the Myerstown site itself versus costs associated with cleaning up or preventing the spread of contamination to property owned by others is similarly a factual question as to which the record is incomplete. Therefore, determination of this claim must await trial.

### G. CERCLA Costs as Damages

 Count V of the amended complaint asserts that the relief sought in the underlying CERCLA claims of the United States Environmental Protection Agency and the PADER are equitable in nature, do not constitute a legal obligation to pay damages, and are therefore not covered under the policies. Although Continental cites case law from other jurisdictions to support its position, it cannot avoid the clear conclusion that its argument is untenable under New Jersey law.

While New Jersey law on this point was fairly clear prior to *Morton, see Broadwell Realty,* 218 N.J.Super. at 526–28, 528 A.2d 76; *CPS Chemical Co. v. Continental Ins. Co.,* 222 N.J.Super. 175, 536 A.2d 311 (App. Div.1988); *Reliance,* 259 N.J.Super. at 565–66, 614 A.2d 642, the Supreme Court's opinion in that case has eliminated any doubt. The court held in *Morton* that "environmental-response costs and remediation expenses ... constitute sums that [an insured] will have to pay 'as damages' because of property damage." *Morton, supra,* at 27, 629 A.2d 831. Thus, it is clear that costs incurred by Beecham pursuant to CERCLA are not excluded from coverage under New Jersey law. Therefore, summary judgment will be granted in favor of Beecham with respect to Count V of the amended complaint.[13]

### V. Conclusion

Continental's motion for summary judgment is denied in all respects. The issues of whether there was an "occurrence" and whether coverage is barred by the pollution exclusion clause are subject to factual disputes which must be resolved at trial. Continental is estopped from denying coverage based on the named insured endorsement and the alienated premises exclusion. Beecham's motion for summary judgment is denied as to the "occurrence" and pollution exclusion clause issues (Counts I and II of the amended complaint) and the owned property exclusion (Count IV) and granted as to the late notice defense (Count III) and the legal damages issue (Count V). Further, Beecham's motion for summary judgment relating to its counterclaims and seeking a declaration that Continental has a duty to defend (First Count), indemnify (Second Count), and pay defense costs (Fourth Count) and that Continental admitted liability by sending an invoice to Beecham for a retrospective premium of $282,224 (Fifth Count) is denied.

An appropriate order shall issue.

---

**13.** Based on its inaccurate albeit optimistic and, certainly, premature conclusion that "uncontroverted expert testimony has established that there were in fact multiple occurrences deriving from a wide variety of sources during each of the policy years in question...." (Def.Opp.Br. at 39) when, in fact, it is far from clear that there has been an "occurrence" at all, Beecham seeks a ruling that the "continuous trigger" theory will apply to this action. That request must await another day.